# 24-1220

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

GISSELLE VASQUEZ,

*Plaintiff-Appellant,*

-against-

YONKERS PUBLIC SCHOOL DISTRICT, DR. EDWIN M. QUEZADA, IN HIS PERSONAL CAPACITY AND PROFESSIONAL CAPACITY,

*Defendants-Appellees,*

CITY OF YONKERS, ROBERT C. DODSON PUBLIC SCHOOL, CESAR CHAVEZ PUBLIC SCHOOL, EVELINA MEDINA, CHRISTOPHER CASSANO, SANDRA GUZMAN,

*Defendants.*

*On appeal from Order and Judgment of the U.S. District Court for the Southern District of New York*

## BRIEF FOR PLAINTIFF-APPELLANT AND SPECIAL APPENDIX

BERLINGIERI LAW, PLLC
244 Fifth Avenue, Suite F276
New York, New York 10001
(347) 766-5185
cjb@nyctlaw.com
*Attorney for Plaintiff-Appellant*

TABLE OF CONTENTS -- BRIEF

*Page*

TABLE OF AUTHORITIES ........................................................................ ii

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................... 2

STATEMENT OF THE CASE ...................................................................... 5

    Facts Relevant to the Issues for Review ............................................... 5

    Procedural History .............................................................................. 7

SUMMARY OF THE ARGUMENT .............................................................. 8

ARGUMENT................................................................................................... 9

  1.  PLAINTIFF CAN ESTABLISH THAT SHE SUFFERED A
      MATERIALLY ADVERSE EMPLOYMENT ACTION AS A
      MATTER OF LAW UNDER SEC. 1983.......................................... 9

  2.  PLAINTIFF CAN ESTABLISH THAT FOR PURPOSES OF A
      MONELL CLAIM UNDER SEC. 1983. THIS DISTRICT IS LIABLE
      BECAUSE DR. QUEZADA WAS A FINAL DECISION AND
      POLICY MAKER AND CHOSE NOT TO INVESTIGATE
      COMPLAINTS OF SEXUAL HARASSMENT OF PLAINTIFF
      WHEN HE HAD ACTUAL KNOWLEDGE OF COMPLAINTS ................ 19

CONCLUSION............................................................................................. 29

CERTIFICATE OF COMPLIANCE............................................................. 30

i

## TABLE OF AUTHORITIES

**CASES:**

*Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003) ......................................... 21

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) .......................................................................................... 10, 14, 17

*Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 281 (N.D.N.Y. 2018) .......................... 13

*Daniel v. Abm Indus., Inc.*, No. 16-CV-1300 (RA), 23-24 (S.D.N.Y. Mar. 31, 2017) .................................................................................................................... 4, 15, 16

*Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640-41 (10th Cir. 2012) ............. 13

*Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ......................................................................................... 9, 10, 11, 13, 15, 16

*Friend v. Gasparino*, 61 F. 4th 77 (2d. Cir. 2023) ...................................................... 19

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) ............................... 16

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) .............................................................. 14

*Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423 (2d Cir. 2004) .......... 19

*Kuhn v. United Airlines*, 63 F. Supp. 3d 796 (N.D. Ill. 2014) .................................... 13

*Littlejohn v. City of N.Y.*, 795 F.3d 297 (2d Cir. 2015) ......................................... 23, 26

*Price v. N.Y.C. Bd. of Educ.*, 51 A.D.3d 277, 855 N.Y.S.2d 530 (2008) ................... 21

*Rochon v. Gonzalez*, 438 F.3d 1211 (D.C. Cir. 2006) ...................................... 10-14, 16

*Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418 (6th Cir. 2014) .................... 14

*Vega v. Hempstead Union Free School District* 801 F.3d at 90 ........................... 14, 15

*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462 (2d Cir.1997) ................................ 9

**STATUTES:**

28 U.S.C.S. § 1291 ......................................................................................................... 1

N.Y. Educ. Law § 2554(13)(a) ...................................................................................... 21

N.Y. Educ. Law § 2566 ............................................................................................ 19, 21

N.Y. Educ. Law § 2590-h(16) ........................................................ 22

N.Y. Educ. Law § 2590-h(17) ........................................................ 21

N.Y. Educ. Law § 2590-h(38) ........................................................ 22

N.Y. Educ. Law § 3012-c(5-c) ........................................................ 22

## TABLE OF CONTENTS—SPECIAL APPENDIX

*Page*

Opinion and Order [Reznik, M.J.] (Mar. 29, 2024)................................................ SpA.1

Clerk's Judgment (Mar. 29, 2024) ....................................................... SpA.25

Notice of Appeal (Apr. 1, 2024) ....................................................... SpA.26

NYS Education Law § 2566 ................................................................. SpA.27

NYS Education Law § 2590-H.......................................................... SpA.30

JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was based on there being federal questions at issue under 42 U.S.C 1983. Defendants-Appellees Yonkers Public School District and Dr. Edwin Quezada filed a motion for summary judgment [D.E. 81-84] to dismiss the Plaintiff-Appellant Gisselle Vasquez's complaint. The District Court granted the motion for summary judgment. By fully granting Defendants' motion for summary judgment issued its final order from which Plaintiff timely appealed on April 29, 2024. This court exercises jurisdiction, pursuant to **28 U.S.C.S. § 1291 as an appeal from a final order.**

STATEMENT OF ISSUES PRESENTED FOR REVIEW

The Second Circuit has not resolved the question of whether an employer's failure to investigate complaints in retaliation for the filing of a prior separate complaint could constitute an adverse employment action by dissuading her from filing future complaints or an EEOC charge. In this case Plaintiff, a school secretary, claims she was subjected to a retaliatory conduct under Sec. 1983, including but not limited to having her Title IX complaint passed around her school prompting her to necessitate a transfer, the failure of the District to launch an investigation into meritorious complaints of Plaintiff's sexual harassment by her principal [i.e. nude photos, sexual affair texts] were materially adverse to her employment as they dissuaded a reasonable worker from making a supporting a charge of discrimination, as there was no underlying EEOC charge or any filing for approximately 3 years after the last date of sexual harassment and retaliation. Plaintiff's terms and conditions of her job became materially worse and this dissuaded Plaintiff from making further complaints. The District took over seven months to communicate with Plaintiff on the status of her Title IX complaint, despite Plaintiff's attempts to communicate with the district's Title IX coordinator investigating her complaint about the assistant principal's harassment or the district's human resources representative.

Further for purposes of a Monell claim under Sec. 1983, Plaintiff argued that

the District is liable for the superintendent Edwin Quezada as a decisionmaker when he did not follow school district policy to investigate Plaintiff's complaints of sexual harassment and showed a deliberate indifference to Plaintiff's complaints of sexual harassment. Specifically, Plaintiff was subjected to deprivation of her Constitutional rights by the superintendent exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe.

The District Court held that Plaintiff's Sec. 1983 retaliation claim lacked sufficient issues of fact on the adverse material impact which affected her employment claim above, despite a showing by Plaintiff with admissible evidence to the contrary and dismissed the Monell claim because it is a derivative claim of the Sec. 1983. [A.1319, A1343]

Based on above, the main issue for review in this case is did the District Court err in finding no genuine issues of material facts on the adverse action prong of a Sec. 1983 retaliation claim, as whether Defendants' failure to investigate the meritorious sexual harassment allegations against her school administrators might dissuade a reasonable worker from making or supporting a charge of sexual harassment in her employment after complaining of sexual harassment under Title IX and raising additional meritorious complaints of sexual harassment to her union president who conveyed them to the Defendant superintendent. Yet no action was taken by the District other than to transfer Plaintiff and avoid her completely despite

multiple attempts to communicate additional complaints in writing and verbally requesting to meet to further report more sexual harassment. Rather the District made Plaintiff wait 7 months to inform her that the underlying Title IX sexual harassment complaint [that was disseminated through the school, despite supposedly being confidential] was deemed founded against the assistant principal. The specific issue for review is whether the standard in *Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) and its progeny *see e.g. Daniel v. ABM Indus., Inc.*, No. 16-CV-1300 (RA), 2017 WL 1216594, at *12 (S.D.N.Y. Mar. 31, 2017) (finding failure to investigate a complaint did not constitute adverse employment action because it would not dissuade a reasonable worker from making or supporting a charge of discrimination) is to be applied here for a Section 1983 retaliation claim where a Plaintiff claims Defendants retaliated against her in a manner affecting her employment in retaliation for complaining of discriminatory actions against her at the school where she preferred to be (Dodson) by the principal.

STATEMENT OF THE CASE

<u>Facts Relevant to the Issues for Review:</u>

Plaintiff [female] brought a Sec. 1983 retaliation action, Plaintiff a current employee of Yonkers Public School District secretary was sexually harassed at work by administrators (principal and assistant principals) at Dodson elementary school. Plaintiff reported the sexual harassment of one of the administrators (the male assistant principal [who tried to kiss Plaintiff]) to her principal (a female, who was also sexually harassing Plaintiff, along with a female assistant principal) and filed a Tile IX complaint against the male assistant principal. The male assistant principal was transferred to a different school. Plaintiff still felt uncomfortable at Dodson school and due to her principal's harassment and Plaintiff felt uncomfortable to complain about principal who was sexually harassing her. Plaintiff saw a backlash from employees when she learned that her confidential Title IX complaint was being spread throughout the school about the male assistant principal.

Plaintiff met with her union leader to request a transfer and complained to him about the sexual harassment of the principal on Plaintiff. The union leader agreed that the superintendent Edwin Quezada should know about the serious sexual harassment of the principal towards Plaintiff and informed superintendent Quezada of Plaintiff's complaint of sexual harassment, and request for transfer. The

superintendent approved the transfer request and transferred Plaintiff to a less favorable job from Plaintiff's perspective. However, the superintendent and school district failed to investigate the complaint of the sexual harassment about Plaintiff's principal despite having actual knowledge of it [after receiving requests in writing and verbally set up a meeting to discuss additional complaints of sexual harassment], nor did they investigate the dissemination of Plaintiff's private Title IX complaint throughout Dodson prior to her transfer.

Plaintiff's terms and conditions of her job became materially worse and this dissuaded Plaintiff from making further complaints. The District took over 7 months to communicate with Plaintiff on the status of her Title IX complaint, despite Plaintiff's attempts to communicate with the district's Title IX coordinator investigating her complaint about the assistant principal's harassment or the district's human resources representative. The uninvestigated meritorious complaints that Plaintiff lodged and attempted to lodge Plaintiff's sexual harassment by her principal were materially adverse to her employment as they dissuaded a reasonable worker from making a supporting a charge of discrimination, as there was no underlying EEOC charge or any filing for approximately 3 years after the last date of sexual harassment and retaliation.

For purposes of a Monell claim under Sec. 1983 the District is liable for the superintendent Edwin Quezada as a decisionmaker and policymaker when he did

not follow school district policy to investigate Plaintiff's complaints of sexual harassment and showed a deliberate indifference to Plaintiff's complaints of sexual harassment. Specifically, Plaintiff was subjected to deprivation of her Constitutional rights by the superintendent exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe.

Procedural History:

*Defendants' Motion for Summary Judgment and the March 29, 2024 Opinion*

Plaintiff filed her complaint with the District Court on May 24, 2021. Prior to decision on summary judgment plaintiff voluntarily dismissed claims in the Complaint against the principal and two assistant principals at various stages of the litigation. On July 21, 2023 Defendants Yonkers Public School and superintendent Dr. Quezada filed their motion for summary judgment. **Plaintiff opposed the motion on August 25, 2023.** On March 29, 2024 the Court issued its opinion granting Defendant's summary judgment motion on her Sec. 1983 retaliation claim primarily because it found that Plaintiff suffered no demonstrable adverse employment action as a result of her protected activity because a failure to investigate complaints of discrimination cannot constitute adverse action and that the *Monell* claim as a derivative claim of the Sec. 1983 was also dismissed, and that Dr. Quezada as a superintendent was not a policymaker and decision maker of the District. (the Opinion). A.1319-1342.

SUMMARY OF THE ARGUMENT

The question raised by this case is whether uninvestigated complaints of sexual harassment constitute retaliation when the Plaintiff shows the existence of demonstrable harm after reporting the underlying complaints. The District Court erred in finding that Plaintiff proffered no demonstrable harm when the retaliation took the form of harm to the person in their employment, by dissuading a reasonable employee from making more complaints as they are prevented from vindicating their right not to be retaliated against in the first place.

This is a question of first impression for this Circuit as the Second Circuit left open the question of whether an employer's failure to investigate a complaint in retaliation for the filing of a prior complaint could constitute an adverse employment action as to whether a Plaintiff has made a sufficed showing that they suffered an adverse employment action where they have proffered admissible evidence that the Defendants failed to investigate sexual harassment complaints due to her earlier complaint of discrimination.

Plaintiff argues the District Court erred in failing to allow Plaintiff to move forward to trial, as she properly showed adverse material employment impact. In doing so, the District Court committed reversible error.

ARGUMENT

**1. PLAINTIFF CAN ESTABLISH THAT SHE SUFFERED A MATERIALLY ADVERSE EMPLOYMENT ACTION AS A MATTER OF LAW UNDER SEC. 1983.**

The District Court relies heavily on *Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) where the Second Circuit holds that "**[A]t least in a run-of-the-mine case** such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."). This is not a typical "run-of-the-mine case" that the Second Circuit wrote about in *Fincher* cautioning District Courts from permitting employees' claims for retaliatory failure to investigate wholly premised on a "miffed accused employer's" failure to investigate "false claims" as the only basis adverse action. *Id.*

In Fincher that Plaintiff argued on appeal that the Defendant's failure to investigate her alleged complaint of discrimination constituted retaliation for her bringing **that same complaint.** *Id. at* 719 [emphasis added].

As the *Fincher* noted the precedent of this Circuit  We have said that "there are no bright-line rules" with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore "courts must pore over each case to determine whether the challenged employment action reaches the level of `adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997).

This is consistent because Sec. 1983 the anti-retaliation law "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. We speak of material adversity because we believe it is important to separate significant from trivial harms. Id. at 68, 126 S.Ct. 2405.

In *Fincher* there was one complaint that went uninvestigated. Here, Plaintiff had her Title IX complaint and 3 other attempts to communicate complaints that constitute protective activity. Even in *Fincher* the court recognized that in some Circuit Courts uninvestigated complainants can constitute adverse action. The District Court here distinguished this present case from a D.C. Circuit ruling (*Rochon v. Gonzalez*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006) where the *Rochon* court found the refusal to respond to the employee's complaint of a death threat was allegedly in retaliation for his separate and earlier complaint of discrimination. The employee contended that if he had never complained of discrimination, his complaint of a death threat against him would have been investigated. *Id.* Making the initial complaint allegedly resulted in the separate retaliatory failure to investigate a subsequent complaint. *See id* at 1220 ("[A] reasonable FBI agent well

might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI in the face of threats against him or his family.").

Here, this case is similar because had Plaintiff not filed her Title IX complaint against the assistant principal that tried to kiss her, Plaintiff's separate complaints of serious sexual harassment from the principal [Medina] and the assistant, principal female [Guzman] would have been investigated.

Had Plaintiff of never complained about sexual harassment via her Title IX complaint, her complaints of sexual harassment of a more serious nature against her principal would have been investigated. The distinction here from *Fincher* is that Plaintiff here lodged her Title IX complaint and then separately complained to her union president who communicated her complaints to the superintendent regarding sexual harassment from Plaintiff's principal [Medina]. At the time Plaintiff requested a transfer she had already filed her Title IX complaint and the information presented to the superintendent via plaintiff union president were new revelations of sexual harassment in detail.

Further Plaintiff's meritorious complaints of sexual-harassment distinct from her initial complaint went investigated – like in *Rochon* – a separate complaint was lodged of serious nature – there a death threat – here serious sexual harassment. Defendants made no inquiry into Plaintiff, complaints after her Title IX complaint

11

which reasonably dissuaded her from ultimately filing an administrative charge with the EEOC or making any other complaints until this present action. As a result, a reasonable school secretary may have been dissuaded from engaging in further protected activity if she knew that would leave her unprotected by the School in the face of future harm, such as sexual harassment or disseminating the details and copy of her underlying Title IX complaint against the assistant principal who tried to kiss her.

Here a reasonable juror could adduce that the Plaintiff was retaliated against because the retaliation resulted not only from the original complaint but rather separate complaints[1] similar to Plaintiff in *Rochon*, leaving Plaintiff open to future

---

[1] Additionally in a footnote in *Fincher* the Second Circuit noted that a case like Plaintiff's present case was not before them in stating clearly "in *Rochon,* the separate complaint that was allegedly ignored as a result of the filing of the initial complaint was of a particularly serious nature. We need not decide here whether an employer's failure to investigate a complaint of discrimination in retaliation for the filing of a separate, earlier complaint of discrimination would rise to the level of an adverse employment action. That question is simply not before us."

This recognition of the issues presented in *Fincher* should limit its application. The district court erred in applying *Fincher* in a broad manner - because in Fincher on those particular facts because there the plaintiff argued her retaliation claim was supported because material adverse action occurred when her underlying complaint of discrimination which premised the entire retaliation claim as a protected activity prong went on investigated. Under that framework limits should be in post when it is just one complaint that goes on investigating here reasonable could reduce that when Plaintiff presented her complaint to her union president who presented it to the superintendent retaliation and sued from the failure to investigate. The subsequent complaint from the Title IX complaint excludes this case from the narrow scope of *Fincher* where it was the same complaint not separate ones that

serious harm. A reasonable jury could conclude uninvestigated complaints constitute

adverse action because Plaintiff here was left off in a worse situation then prior to

lodging her original complaint as she was dissuaded from making an EEOC

complaint. Plaintiff has alleged precisely this type of conduct and created a material

issue of fact at summary judgment.

As a result, a reasonable jury could conclude that Plaintiff's complaint caused

Defendant to engage in actions that disadvantaged her. Which is inapposite to

*Fincher* finding that there can be no retaliation claim where a plaintiff's "situation in

the wake of her having made the complaint is the same as it would have been had

she not brought the complaint."

---

the Plaintiff premised here entire retaliation claim off of and the District Court
erred in holding that there was no adverse action. That rule makes sense in cases
where it is a single complaint, however here, this case is extraordinary – like
*Rochon* the nature of the serious complaint that went uninvestigated should be
taken into context should constitute adverse action. *Fincher* has had wide impact
on a Plaintiff's ability to make a retaliation claim for uninvestigated complaint
comprising adverse action, *see Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 281
(N.D.N.Y. 2018)(finding official's failure to document or investigate plaintiff's
assault claims did not constitute an adverse action and noting that "failure to
investigate a complaint cannot be considered an adverse . . . action taken in
retaliation for the filing of that same complaint" because it "will not ordinarily
constitute a threat of further harm[.]") (*citing Fincher* 604 F.3d 721-22 n. 8); *Kuhn
v. United Airlines*, 63 F. Supp. 3d 796, 802-03 (N.D. Ill. 2014) ("[T]he Second and
Tenth Circuits have held that failure to investigate a complaint, where the protected
activity at issue is the making of the same complaint, does not constitute an
adverse action.[ ] This is because `a failure to investigate a complaint, unless it
leads to demonstrable harm, leaves an employee no worse off than before the
complaint was filed.'") (*citing Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620,
640-41 (10th Cir. 2012); *Fincher*, 604 F.3d at 721).

However, the logic in *Fincher* and its offshoots do not create an absolute rule, Courts have concluded that failure to investigate complaints qualify for adverse action when the retaliation resulted from a separate complaint or protected act. *See Seoane-Vazquez v. Ohio State Univ., 577* F. App'x 418 (6th Cir. 2014) ("A failure to investigate a complaint can constitute an act of retaliation under some circumstances—for example, if the failure is in retaliation for some separate, protected act by the plaintiff, apart from the uninvestigated complaint itself."). *(citing Fincher* 604 F.3d 722*, Rochon* 438 F.3d 1219-20 *).* Here, the adverse act was in dissuading Plaintiff from making any further complaint or an EEOC charge.

The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that `could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" V*ega v Hempstead Union Free School District* 801 F.3d at 90 (*quoting Burlington*, 548 U.S. at 57); *see also Hicks v. Baines*,593 F.3d 159, 162 (2d Cir. 2010) ("[R]etaliation is unlawful when the retaliatory acts were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (citation and quotation marks omitted)). Accordingly, "an action need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim."

The District Court reached the opposite conclusion based on its finding that

Plaintiff's uninvestigated complaints did not constitute adverse action[2]. The court relied on *Daniel v. Abm Indus., Inc.*, No. 16-CV-1300 (RA), 23-24 (S.D.N.Y. Mar. 31, 2017) ("Although failure to investigate can constitute an adverse employment action "if the failure is in retaliation for some separate, protected act by the plaintiff," *id.* at 722, Plaintiff's threat to file an EEOC complaint was made in the same e-mail as his accusation of "racist favoritism," Ex. 2, at 23. It is thus doubtful that the threat could fairly be described as a "separate, protected act." *Fincher*, 604 F.3d at 722. Nevertheless, even assuming that it could be, the Court is not convinced that ABM's alleged failure to investigate Plaintiff's removal would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (quotation marks omitted).").

Appellant respectfully disagrees with the District Court's decision for the reasons above as the court ignores Plaintiff's separate complaint to Turner of sexual harassment that was conveyed it to Dr. Quezada and the resulting future failure to

---

[2]Here, the District Court writes "At worst, Defendants failed to fully investigate Plaintiff's complaints against Medina and Guzman after she conveyed them to YPS officials. But Plaintiff can point to no demonstrable harm that worsened the conditions of her employment or otherwise adversely affected her because of those failures. Considering the facts of Plaintiff's case in context, no reasonable juror could find that a reasonable worker might be dissuaded from making a future complaint as a result of Defendants' failures to investigate. Indeed, Plaintiff herself did report sexual harassment discrimination to YPS officials in the months that followed her transfer, including messages sent to Voorheis on May 21, 2019, and November 19, 2019. (ECF No. 92 at 10, 21)." [A.1333]

address the serious issues at Dodson.

Further giving credence to the fact that Plaintiff's uninvestigated complaints are adverse action is that her only truly investigated complaint was meritorious. Thereby the District Court's concern over the effects of a ruling that would open the floodgates for litigious plaintiff employees who bring false complaints just to use them as a premise for retaliation claims if they go uninvestigated is misplaced – that is not the case here. *Fincher* left the door open for claims just like this instant case were the circumstances are extraordinary (see e.g. *Rochon*) and where the real harm resulted in dissuading Plaintiff from making other complaints.

It should be noted that other than her Title IX complaint and her complaint to Turner the union president who conveyed that sexual harassment complaint to the District, Plaintiff never got the opportunity to meet or discuss the serious sexual harassment complaints about Medina and Guzman that she brought to light. The District actively avoided her, further Plaintiff's complaints were all prior to the actual disclosure of the results of the Title IX investigation in , leading Plaintiff to believe from her perspective that her follow ups to Voorheis and Forget went uninvestigated as well (in addition to the Turner complaint to Quezada that went nowhere).

Accepting the District Court's interpretation of *Fincher* would result in a narrowing of the already narrow rule that *Fincher* creates. *See*, *e.g.*, *Daniel v. Abm*

*Indus., Inc.*, No. 16-CV-1300 (RA), 24 (S.D.N.Y. Mar. 31, 2017) *quoting Hawkins v. Anheuser-Busch*, *Inc*., 517 F.3d 321, 349 (6th Cir. 2008) (holding that an employer's failure to investigate allegations that a plaintiff's car was set on fire by a co-worker could constitute an adverse employment action) and *Rochon v. Gonzalez,* the D.C. Circuit held that an agent of the Federal Bureau of Investigation ("FBI") had stated a claim for retaliation where he alleged that the FBI had failed to investigate a complaint about a death threat against the agent and his family. 438 F.3d 1211, 1219-20 (D.C. Cir. 2006).

If the District Court's ruling stands, then claims for uninvestigated complaints would only be actionable if there is severe harm or death threats or violence. That is an unworkable rule and contrary to the Supreme Court's holding in *Burlington* that "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67. Otherwise, employer defendants can retaliate by failing to investigate meritorious complaints of discrimination and harassment and get away with it by dissuading complainants from following through with future complaints or EEOC or administrative complaints. In other words, when an employer chooses to blind itself to its employees' complaints of discrimination they need not look into things they intentionally ignore despite the existence of demonstrable harm.

The District Court claims that Plaintiff was not reasonably dissuaded from

making a future complaint as a result of Defendant's failure to investigate, as "Indeed, Plaintiff herself did report sexual harassment discrimination to YPS officials in the months that followed her transfer, including messages sent to Voorheis on May 21, 2019, and November 19, 2019." A crucial point missed is Plaintiff's complaint to Turner *prior* to her transfer. Further as clarified above and as the record shows – Plaintiff never got the opportunity to discuss or meet with a school district official about the complaints she had about her principal (Medina) and to lesser extent Guzman the assistant female principal – that were serious in nature. The messages the Court refers to that Plaintiff sent to Voorheis on May 21, 2019, and November 19, 2019 were not full blown complaints with details – rather they were disclosures that Plaintiff had more information to disclose regarding Medina and Guzman.

18

## 2. PLAINTIFF CAN ESTABLISH THAT FOR PURPOSES OF A MONELL CLAIM UNDER SEC. 1983. THIS DISTRICT IS LIABLE BECAUSE DR. QUEZADA WAS A FINAL DECISION AND POLICY MAKER AND CHOSE NOT TO INVESTIGATE COMPLAINTS OF SEXUAL HARASSMENT OF PLAINTIFF WHEN HE HAD ACTUAL KNOWLEDGE OF COMPLAINTS

The District Court erred, in ruling that Dr. Quezada was not a policymaker[3] – rather the school District's Board of Education was in charge. "The Superintendent's power to enforce "rules and regulations" is done "under the direction of the board of education" to whom the Superintendent must "report" violations and "submit" all facts "for its consideration and action." N.Y. Ed. Law §§ 2566(2), (6)." In *Friend v. Gasparino*, 61 F. 4th 77, 99 (2d. Cir. 2023)) – the Second Circuit held "*Were we* to 'equat[e] a final decisionmaker with a final policymaker,' we 'would effectively impose respondeat superior liability—making the municipality liable for the conduct of its employees—in violation of *Monell.*'" Here, Quezada was both decisionmaker and policymaker when he chose to make up a new policy not to investigate Plaintiff's complaints. The District Court erred when it doubted that Quezada could be both a policymaker and decision maker at the same time and whether his choice to turn a blind eye to Plaintiff's complaints was adverse.

---

[3] *See Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423, 424–25, 427 (2d Cir. 2004) (summary order) ("Even if [Superintendent] Romandetto was the *decisionmaker* with regard to Hurdle's transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers").

Quezada made his own policy not to investigate complaints of sexual harassment. The failure to set up a meeting with Plaintiff regarding her other complaints of harassment and why she felt unsafe was materially adverse to Plaintiff's employment. For example, when Forget (HR) failed to set up a meeting with Plaintiff. This was materially adverse, because Plaintiff found herself in an environment that was conducive to creating an atmosphere of plausible deniability. The School District HR did not want to know what was going on with Plaintiff at Dodson despite her apparent and consistent complaints around the time of the transfer (April 2019). After Plaintiff's complaints went uninvestigated and she settled into her new worse role at Chavez, Plaintiff was deterred from bringing any further complaints until this action.

The pertinent question here is whether Quezada or Forget had a duty to follow up or further investigate what made Plaintiff "feel unsafe" at Dodson when Cassano had already been transferred, which would support a conclusion that it was not only Cassano that was making her feel unsafe but someone else, in this case Medina and Guzman.

The Supreme Court has held that a municipality may be liable for the acts of a single official—but only if that official is someone "whose edicts or acts may fairly be said to represent official policy" for the entire municipality. *Monell,* 436 U.S. at 694, *Agosto* 982 F.3d at 98. "It is not enough that an official had discretion to make

a decision that was unreviewable." *Id. citing Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "Rather, the official must have been sufficiently high up in the municipal hierarchy' ... that he was responsible under state law for making policy in that area of the municipality's business'" *Agosto* 982 F.3d at 98-99. Further "responsib[ility] under state law for making policy" in any "area of the [Department of Education's] business" at issue in this case, such that his "edicts or acts" would be considered to "represent official policy" for the entire municipality is required for liability as a matter of law. *Agosto* 982 F.3d at 100-101, *Monell*, 436 U.S. at 694.

In Dr. Quezada's position as superintend of schools for YPS he is vested under N.Y. Educ. Law § 2566 with ultimate authority in the district on all policies and decisions.

Dr. Quezada has the authority to make decisions that bind the school district. *See e.g. Agosto* 982 F.3d 86, 98-99 ("The chancellor shall ... [c]ontrol and operate ... academic and vocational senior high schools."). For example, the chancellor has "authori[ty] to implement ... `such regulations and by-laws as may be necessary ... for the general management, operation, control, 99*99 maintenance and discipline of the schools,'" Price v. N.Y.C. Bd. of Educ., 51 A.D.3d 277, 279-80, 855 N.Y.S.2d 530 (2008) (citing N.Y. Educ. Law §§ 2590-h(17), 2554(13)(a)), and to "[p]romulgate such rules and regulations as he or she may determine to be necessary or convenient to accomplish the purposes of [the New York Education Law]," N.Y.

Educ. Law § 2590-h(16). As relevant here, the chancellor has authority to make "a final determination" when teachers appeal poor ratings, id. § 3012-c(5-c), and to resolve formal disciplinary proceedings brought against teachers and staff, including the power to terminate their employment, id. § 2590-h(38)."

Here, Plaintiff has shown that Quezada was vested with state power to enforce all YPS policies and failed to follow up with Plaintiff or Turner after Turner had conveyed Plaintiff's complaints of Medina's sexual harassment and even after she had complained in her transfer request in April 2019, about unsafe conditions and Quezada replied simply "Thank you".

As superintendent of Schools, Quezada knew or should have known that something was wrong or distressing Plaintiff, insofar as that Cassano had been instantly transferred as he committed egregious sexual harassment on Plaintiff at Dodson, but Quezada exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe. Further, Plaintiff has alleged sufficiently that Quezada failed to instruct his subordinate, Forget (HR) to follow up in a meaningful way with an investigation about Plaintiff's safety concerns, which would have uncovered Medina's and Guzman' sexual harassment.

The safety issue from Plaintiff's point of view came from the sexual harasser Medina, because Plaintiff feared reprisal from considering the situation that Medina had put her in preceding her complaints about Cassano. Quezada failed to do

anything other than initiate the transfer behind the scenes, but only said "Thank you" to Plaintiff, thereby willfully ignoring an employee who is desperately reaching out for help.

Plaintiff was subjected to deprivation of her Constitutional rights by Quezada because he "exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 314 (2d Cir. 2015). This deliberate indifference could have been avoided if he investigated this complaint himself or delegated a subordinate to investigate such as Forget or another HR person, or if Quezada simply emailed Plaintiff back to set up a meeting to discuss why she felt unsafe.

Rather the easy way out was to simply initiate the purported voluntary transfer of Plaintiff to Chavez (which as described above was materially adverse to Plaintiff) instead of actually trying to get to the root cause of the problem here, Principal Medina's sexual harassment. Therefore, the Complaint as pleaded is sufficient to establish a claim against Quezada because he exhibited a deliberate indifference to Plaintiff when she said that she felt unsafe. Perhaps Quezada took no action because Cassano had been transferred away from Plaintiff, however at a minimum, Quezada failed to act on information indicating that unconstitutional acts were occurring by Plaintiff's complaint on April 17, 2019.

When Plaintiff informed Quezada that she was unsafe, Quezada should have

23

at a minimum inquired as to why she didn't feel safe, but he didn't. Plaintiff has shown a material issue of fact that he failed to do so deliberately, because it was the path of least resistance and if he transferred Plaintiff, then in his view, perhaps this would all go away even after Turner had advised him of Medina's sexual harassment. Quezada should have at least made an attempt to uncover more pervasive and shocking sexual harassment than what had bubbled to the surface at Dodson already via Plaintiff's complaints about Cassano. Quezada had a duty to inquire with Plaintiff about her personal safety at Dodson and failed to do so; we therefore allege the Counts in the Complaint that pertain to him are sufficient to proceed against him. It is Plaintiff's position that Quezada, like the proverbial ostrich, stuck his head in the sand after the transfer of Plaintiff and turned a blind and indifferent eye to Plaintiff's valid concerns of safety due to sexual harassment at Dodson that precipitated the request in the first place.

Plaintiff sufficiently proffered evidence to proceed to trial on *Monell* § 1983 claim against Quezada for his deliberate indifference to stop the retaliation against Plaintiff and the hostile work environment that she endured.

However, Quezada and Forget failed to even do a minimal inquiry here about Plaintiff's safety post-Cassano's transfer even though she had credibly complained about being sexually harassed by Cassano. One could adduce from her email to Quezada that she was in fact suffering more harassment of the same nature, however

no path of inquiry into such circumstances ever arose. Perhaps it is easier to not follow up with complaints and reveal the truth of a distressing situation to an employee than to do a full blown investigation into sexual harassment at Dodson as a whole, considering what may be uncovered.

Similarly, Plaintiff's experience with the Title IX investigation fared no better, ungulated from borderline malfeasance to downright incompetence, (for *e.g.* the Title IX officer Voorheis failed to respond to Plaintiff's requests for an update on whether the case was closed until November 2021 over 7 months after Plaintiff lodged her Title IX complaint, more than 4 months after the Title IX officer had submitted his investigation memo to Quezada finding sexual harassment had occurred) and was less than what she expected and materially adverse, because after having her original complaint about Cassano being passed around by staff at Dodson (which Plaintiff thought was supposed to be a confidential process – or at least for individuals in the need to know – Plaintiff's privacy rights were diminished with respect to her complaint to Voorheis as it became widely known at Dodson without Plaintiff's or ostensibly even Cassano's disclosure), despite waiting months for any investigation outcome, it wasn't until after Plaintiff contacted Voorheis in November 19, 2019, to inform him that she became aware that others were aware of the specifics of her Title IX complaint did Voorheis respond "Sorry for the delay in responding to your inquiry. The case you were inquiring about was deemed founded.

The Department of Human Resources considers this investigation completed and closed." See Compl.at 83. Plaintiff never received any follow up.

As superintendent of Schools, Quezada knew or should have known that something was wrong or distressing Plaintiff, insofar as that Cassano had been instantly transferred as he committed egregious sexual harassment on Plaintiff at Dodson but Quezada exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe. Further, Plaintiff has alleged sufficiently that Quezada failed to instruct his subordinate, Forget (HR) to follow up in a meaningful way with an investigation about Plaintiff's safety concerns, which would have uncovered Medina's and Guzman' sexual harassment.

The safety issue from Plaintiff's point of view came from the sexual harasser Medina, because Plaintiff feared reprisal from considering the situation that Medina had put her in preceding her complaints about Cassano. Quezada failed to do anything other than initiate the transfer behind the scenes, but only said "Thank you" to Plaintiff, thereby willfully ignoring an employee who is desperately reaching out for help.

Plaintiff was subjected to deprivation of her Constitutional rights by Quezada because he "exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring" *Littlejohn* 795 F.3d at 314. This deliberate indifference could have been avoided if he investigated this complaint

himself or delegated a subordinate to investigate such as Forget or another HR person, or if Quezada simply emailed Plaintiff back to set up a meeting to discuss why she felt unsafe.

Rather the easy way out was to simply initiate the purported voluntary transfer of Plaintiff to Chavez (which as described above was materially adverse to Plaintiff) instead of actually trying to get to the root cause of the problem here, Principal Medina's sexual harassment.

Quezada because he exhibited a deliberate indifference to Plaintiff when she said that she felt unsafe. Perhaps Quezada took no action because Cassano had been transferred away from Plaintiff, however at a minimum, Quezada failed to act on information indicating that unconstitutional acts were occurring by Plaintiff's complaint on April 17, 2019.

When Plaintiff informed Quezada that she was unsafe, Quezada should have at a minimum inquired as to why she didn't feel safe, but he didn't. We allege he failed to do so deliberately, because it was the path of least resistance and if he transferred Plaintiff, then in his view, perhaps this would all go away. Quezada should have at least made an attempt to uncover more pervasive and shocking sexual harassment than what had bubbled to the surface at Dodson already via Plaintiff's complaints about Cassano. Quezada had a duty to inquire with Plaintiff about her personal safety at Dodson and failed to do so; we therefore allege the Counts in the

Complaint that pertain to him are sufficient to proceed against him. It is Plaintiff's position that Quezada, like the proverbial ostrich, stuck his head in the sand after the transfer of Plaintiff and turned a blind and indifferent eye to Plaintiff's valid concerns of safety due to sexual harassment at Dodson that precipitated the request in the first place.

CONCLUSION

For the foregoing reasons, Plaintiff requests this Court reverse the District Court's holding that Plaintiff failed to show adverse employment action by Defendants and permit her Sec. 1983 claim to proceed and her *Monell* claim to proceed.

Dated:      New York, New York
              August 13, 2024

Respectfully submitted,

BERLINGIERI LAW, PLLC
*Attorney for Plaintiff-Appellant*

By:   */ s / Christopher J. Berlingieri*

CHRISTOPHER J. BERLINGIERI, ESQ.
244 Fifth Avenue, Suite F276
New York, New York 10001
Tel.:  (347) 766-5185
Fax:  (914) 730-1044
Email: cjb@nyctlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by Microsoft Word 2013, the word-processing system used to prepare it, this brief contains 6,504 words.

Dated:      August 13, 2024

*/ s / Christopher J. Berlingieri*

_____

CHRISTOPHER J. BERLINGIERI, ESQ.
*Attorney for Appellant*

# SPECIAL APPENDIX

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _ 3/29/2024

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

GISSELLE VASQUEZ,

                 Plaintiff,

               -against-

YONKERS PUBLIC SCHOOL DISTRICT,
DR. EDWIN M. QUEZADA.

                 Defendants.

-------------------------------------------------------------X

21-cv-4620

**OPINION & ORDER**

VICTORIA REZNIK, United States Magistrate Judge:[1]

      Pending before the Court is a joint summary judgment motion filed by Defendants

Yonkers Public School District (YPS) and Dr. Edwin M. Quezada.  (ECF No. 81).  For the

reasons below, Defendants' motion for summary judgment is **GRANTED**.[2]

         I.       **FACTUAL BACKGROUND**[3]

      On September 27, 2013, Plaintiff began her employment with YPS as a School Aide

---

[1] On May 24, 2022, the parties consented to proceed before a Magistrate Judge (ECF No. 60) and this case was assigned to Magistrate Judge Paul Davison.  On May 24, 2023, this case was reassigned to the undersigned.

[2] On March 14, 2024, Plaintiff filed a proposed order dismissing with prejudice the case against Defendant Evelina Medina under Rule 41(a)(2) of the Federal Rules of Civil Procedure.  (ECF No. 94).  The following day, this Court so-ordered Plaintiff's proposed order and dismissed the case against Medina.  (ECF No. 95).  As a result, this Opinion & Order does not address the summary judgment motion previously filed by Medina on July 21, 2023. (ECF No. 77).

[3] Unless otherwise stated, the following facts are undisputed and are derived from YPS's and Quezada's Rule 56.1 Statement of Facts, Plaintiff's Responses and Statement of Additional Material Facts to YPS's and Quezada's Rule 56.1 Statement, and YPS's and Quezada's Responses to Plaintiff's Statement of Additional Material Facts.  (ECF No. 92). When citing these facts, all internal citations, quotation marks, footnotes, and alterations are omitted, unless otherwise noted.

assigned to Saunders Trade and Technical High School.  (ECF No. 92 at 3).[4]  Plaintiff was

promoted to the position of Clerk I-Spanish Speaking in April 2016 and assigned to work at

Dodson Public School.  (*Id.* at 3).  Evelina Medina was the Principal of Dodson during Plaintiff's

employment there and Christopher Cassano was an Assistant Principal.  (*Id.* at 3 – 4).[5]

Plaintiff's complaint adds that Sandra Guzman was an Assistant Principal at Dodson as well.[6]

(ECF No. 1 at 3).

Plaintiff alleges that Medina sexually harassed her in various ways during her

employment at Dodson.  (ECF No. 92 at 11 – 13).[7]  Plaintiff alleges that Medina asked Plaintiff

to photograph Medina with her "pants down" and then requested that Plaintiff "edit the photos to

remove cellulite."  (*Id.*)  Plaintiff also alleges that Medina "demanded that Plaintiff store photos

of her boyfriend's penis and a photo of him in his underwear on Plaintiff's phone," and that

Medina "grabbed Plaintiff by the neck to simulate sex with her boyfriend."  (*Id.*)  In addition,

Plaintiff alleges that Medina "asked Plaintiff to buy her romantic lingerie from Romantic Depot,"

and "encouraged Plaintiff to have a sexual relationship with Mr. Cassano."  (*Id.*)  Plaintiff also

alleges that she was sexually harassed by Guzman, including an allegation contained in

Plaintiff's complaint that Guzman asked her "[h]ow many times a week do you have sex?"  (ECF

No. 1 at 6; ECF No. 92 at 7, 10, 14).

---

[4] ECF No. 92 restarts labeling its numbered paragraphs on page 11, which means that there are duplicated paragraph numbers.  As a result, this opinion cites to the applicable page number, instead of the paragraph number.  All cited page numbers in this order refer to the number printed at the bottom of the filed page, unless otherwise stated.
[5] On January 19, 2022, Judge Vincent Briccetti granted Cassano's motion to dismiss.  (ECF No. 46).
[6] On January 19, 2022, Judge Briccetti granted Guzman's motion to dismiss.  (ECF No. 46).
[7] Plaintiff included these allegations in the Statement of Additional Material Facts that she filed in response to YPS's and Quezada's Rule 56.1 Statement.  (ECF No. 92).  Medina did not file a response to Plaintiff's Statement of Additional Material Facts, but Defendants YPS and Quezada did file a response and deny knowledge or information sufficient to admit or deny the allegations about what occurred between Plaintiff and Medina.  (ECF No. 92 at 11 – 13).  In any event, even accepting these allegations as true, Plaintiff's remaining Section 1983 Retaliation and *Monell* claims fail for the reasons outlined in Section IV.

SpA.2

On March 29, 2019, Cassano attempted to kiss Plaintiff while in the back of Dodson's main office. (ECF No. 92 at 4, 13 – 14). On or about April 10, 2019, Plaintiff complained to Medina about Cassano's conduct. (*Id.* at 5). On April 11, 2019, Plaintiff filed a written Title IX Complaint about Cassano's conduct with the City of Yonkers Human Resources Department. (*Id.*) The Title IX Complaint did not mention any inappropriate conduct by Medina. (*Id.*) On April 12, 2019, Dr. Quezada (the Superintendent) transferred Cassano out of Dodson and Plaintiff spoke with EEO Coordinator Robert Voorheis and another unidentified female from HR about her Title IX complaint. (*Id.* at 5, 6). Voorheis is designated under the YPS Title IX policy to handle Title IX claims. (*Id.* at 6). The Plaintiff did not make any complaints to Voorheis about Medina during the April 12 discussion. (*Id.* at 6).

In April 2019, Plaintiff sought the help of Lionel Turner, President of the CSEA Union, to obtain a transfer out of Dodson. (*Id.* at 7).[8] Turner spoke to Quezada and Quezada asked Turner to have Plaintiff email him a transfer request. (*Id.* at 7, 16).[9] On April 17, 2019, Plaintiff emailed Dr. Quezada and requested that she be transferred out of Dodson. (*Id.* at 7 – 8). That same day, Quezada emailed Deputy Commissioner of Human Resources, Theresa Forget, asking her to effectuate the transfer on April 23, 2019 (after the Easter Break). (*Id.* at 8).

On April 23, 2019, Plaintiff was "voluntarily" transferred "at her request" from her Clerk I-Spanish Speaking position at Dodson to a Clerk I-Spanish Speaking position at Cesar Chavez

---

[8] Plaintiff alleges that she relayed to Turner allegations of sexual harassment against Medina, Cassano, and Guzman. (ECF No. 92 at 7). Plaintiff also claims that she reported to Turner that her Title IX Complaint against Cassano was "being spread around Dodson." (*Id.*)

[9] The parties dispute what Turner conveyed to Quezada, and both Turner and Quezada gave conflicting deposition testimony regarding which of Plaintiff's allegations Turner mentioned to Quezada. (ECF Nos. 82-4 at 80 – 87; 82-8 at 20 – 30; 92 at 7, 15, 16). Quezada testified that "[m]y recollection is that he [Turner] indicated that Ms. Vasquez felt uncomfortable because people in school were talking about her complaint," and Turner testified that he informed Quezada that Plaintiff was sexually harassed by Medina. (ECF Nos. 82-4 at 84; 82-8 at 20 – 30). Plaintiff endorses Turner's testimony (ECF No. 92 at 7). For the reasons explained in Section IV below, even if the Court resolves this ambiguity in Plaintiff's favor and assumes that Turner's version is correct, Plaintiff's claims still fail as a matter of law.

SpA.3

Public School. (*Id.* at 1, 3, 8).[10]  Plaintiff had no further contact with Medina after this transfer. (*Id.* at 8).  On September 1, 2020, Plaintiff began leave under the Family First Coronavirus Response Act (FFCRA) and returned to work on November 24, 2021.  (*Id.* at 10 – 11).  The written job descriptions of "Clerk I-Data" and "Clerk I-Spanish Speaking" are identical except that a Clerk I-Spanish Speaking is required to speak Spanish and translate.  (*Id.* at 2 – 3).  At Dodson, Plaintiff's work hours were from 7:30 am – 3:00 pm.  (*Id.* at 3).  When Plaintiff began working at Cesar Chavez, her work hours were from 8:30 am – 4:30 pm.  (*Id.* at 2).  The week she began work at Cesar Chavez, she asked to change her work hours due to childcare needs. (*Id.*)  In response, that same week the principal changed her hours to 8:00 am – 3:30 pm.  (*Id.*) In addition, "[P]laintiff's salary did not change when she was transferred from Dodson to Cesar Chavez and she continued to receive all pay increases and benefits to which she is entitled under the collective bargaining agreement ("CBA") between the Yonkers Board of Education and CSEA."  (*Id.* at 4).

On April 25, 2019, while her Title IX complaint was being investigated, Plaintiff emailed Theresa Forget (the Deputy Commissioner of HR) asking for a meeting on April 26 and stating that she would like to share some information.  (*Id.* at 8).  Forget responded and said that she was unavailable on April 26 and asked whether another HR employee could assist.  (*Id.* at 9).

---

[10] Despite acknowledging on pages 1 and 8 of the parties' Rule 56.1 submission that Plaintiff serves as a Clerk I-Spanish Speaking at Cesar Chavez, on page 11 of that same document, Plaintiff denies currently working as a Clerk I-Spanish Speaking and states that "[she] currently works in a less favorable role at Chavez as Data Clerk I." (ECF No. 92 at 1, 8, 11). In her deposition, Plaintiff stated that at Chavez "[I am] sitting as a clerk 1 Spanish-speaking, but I'm doing the duties of a data clerk, which is a lot more work than I was doing at Dodson." (ECF No. 82-3 at 77). Elsewhere in her deposition, Plaintiff notes that at Dodson "80 percent of my job, [sic] there was just translation," and that at Cesar Chavez she handles other tasks such as attendance, report cards, and late passes. (*Id.* at 7 – 8). In her brief, Plaintiff first claims that "YPS transferred Plaintiff to Chavez school as a Data Clerk I with different less favorable hours and duties" (ECF No. 88 at 2) and later claims that her transfer "added a double role as a Data Clerk in addition to her primary and original role of Clerk Spanish Speaking I." (*Id.* at 15). (The parties' papers appear to interchangeably use numerous variations of the "Data Clerk" and "Clerk I-Spanish Speaking" titles – i.e. "Data Clerk I" vs. "Clerk I-Data" – so the Court does not distinguish between the variations of those terms in this order).

4

SpA.4

On April 26, 2019, Plaintiff responded to Forget stating that she managed to speak with Voorheis (the EEO Coordinator) and that if she needed to speak with Forget in the future she would contact her office for an appointment.  (*Id.*)

On April 29, 2019, the Plaintiff sent a letter to Mr. Voorheis, stating that, "as they discussed on April 26, she felt there was a breach of privacy because another employee had information about her Title IX complaint."  (*Id.*)  Voorheis did not investigate Plaintiff's concerns about her complaint being disseminated at Dodson after she was transferred out of the school.  (*Id.* at 19).

On May 21, 2019, Plaintiff wrote to Mr. Voorheis, without copying Quezada or any other YPS employee, asking for the status of her case and stating that there is other information that she would like to inform him about.  (*Id.*)  Plaintiff explained that "I feel safe addressing it now that I am no longer at Robert C. Dodson."  (ECF No. 82-15 at 2; *see also* ECF No. 92 at 9).

Voorheis completed investigating Plaintiff's Title IX complaint and prepared a report dated June 10, 2019.  (ECF No. 92 at 9).  Voorheis provided a copy of this report to Quezada in June 2019.  (*Id.*)  On November 19, 2019, Plaintiff wrote to Voorheis, without anyone else copied, and mentioned that she had other information to provide to him, such as a voice recording of Cassano apologizing for trying to kiss her and other information on Ms. Medina and Ms. Guzman.  (*Id.* at 10).  On November 21, 2019, Voorheis replied to this email by advising Plaintiff that her Title IX Complaint against Cassano was considered founded and is now closed. (*Id.* at 10).  Voorheis testified that he did not advise Plaintiff of the outcome of her Title IX complaint against Cassano before November 2019 due to an oversight.[11]  (*Id.* at 10, 23; ECF No.

---

[11]  Plaintiff appears to "deny, as characterized," this fact in response to paragraph 48 of page 10 of the combined Rule 56.1 Statement.  But Plaintiff appears to acknowledge this fact in paragraph 50 of page 23 of the same document.  (ECF No. 92 at 10, 23).

SpA.5

82-6 at 65).[12]  By that time, Medina had resigned from her employment with YPS effective August 2019.  (ECF No. 92 at 4).

## II.    PROCEDURAL BACKGROUND

On May 24, 2021, Plaintiff filed a complaint against the City of Yonkers, YPS, Dodson, Cesar Chavez, Medina, Cassano, Guzman, and Quezada.  (ECF No. 1).  In it, she alleges that she was sexually harassed by Medina, Cassano, and Guzman and that YPS and Quezada retaliated against her when she tried to report the misconduct.  (*Id.*)  On August 18, 2021, Medina filed her answer (ECF No. 22) and Defendants City of Yonkers, YPS, Dodson, Cesar Chavez, and Quezada jointly moved to dismiss (ECF No. 23).  On August 31, 2021, Guzman and Cassano moved to dismiss.  (ECF Nos. 30, 33).[13]

On January 19, 2022, Judge Briccetti issued an order granting in part the motions to dismiss, after which the only remaining claims were those against Medina and "plaintiff's Section 1983 retaliation and *Monell* claims against the Yonkers Public School District and Quezada (First and Second Causes of Action)."  (ECF No. 46 at 1).  On February 9, 2022, Judge Briccetti held a telephonic conference where he explained the Court's order on the parties' motions to dismiss.  (ECF No. 71-1).  Judge Briccetti also so-ordered a stipulation between the parties that dismissed all claims against Medina except for the Section 1983 retaliation and *Monell* claims (First and Second Causes of Action).  (ECF No. 51).

On February 2, 2022, YPS and Dr. Quezada filed their answer.  On May 24, 2022, pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before a Magistrate Judge and this case was reassigned to Magistrate Judge Paul Davison.  (ECF No. 60).  On May 24, 2023,

---

[12] ECF No. 82-6 is a deposition transcript.  All citations to deposition transcripts include a pin cite to the pdf page number and not the page number at the bottom of the filed page.
[13] Cassano re-filed on September 7, 2021, due to a filing error.  (ECF No. 36).

SpA.6

this case was reassigned again to the undersigned.  On July 21, 2023, Defendants YPS and

Quezada filed a joint motion for summary judgment (ECF No. 81) and Evelina Medina moved

for summary judgment as well (ECF No. 77).  On March 14, 2024, Plaintiff filed a proposed

order voluntarily dismissing her claims against Medina, and this Court so-ordered Plaintiff's

request the next day.  (ECF Nos. 94, 95).  Consequently, the only remaining claims are the

Section 1983 retaliation and *Monell* claims against YPS and Quezada.

### III.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  A fact is material under Rule 56 where it "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Red Tree Invs., LLC

v. Petróleos de Venez., S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).  A dispute about a material fact is

"genuine" when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id*.  In determining whether the moving party has met its burden of proving

that there are no genuine disputes of material fact, the Court must resolve all ambiguities and

draw all factual inferences for the party opposing the motion.  *Union Mut. Fire Ins. Co. v. Ace

Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).  "Assessments of credibility and choices

between conflicting versions of the events are matters for the jury, not for the court on summary

judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

"When the nonmoving party bears the burden of proof at trial, summary judgment is

warranted if the nonmovant fails to make a showing sufficient to establish the existence of an

element essential to its case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration and

internal quotation marks omitted).  Thus, "[a] defendant moving for summary judgment must

SpA.7

prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996). Summary judgment is also appropriate when the movant submits undisputed evidence "that negates an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). But summary judgment must be denied if the Court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## IV.    <u>DISCUSSION</u>

After voluntarily dismissing her claims against Defendant Medina, Plaintiff's two remaining claims are the Section 1983 retaliation claim (in Count 1) and the *Monell* claim (in Count 2) against both YPS and Quezada. For her retaliation claim, Plaintiff alleges that she suffered materially adverse employment actions because (1) she was transferred to Cesar Chavez; (2) YPS officials failed to properly investigate her various complaints; and (3) YPS officials delayed notifying her about the outcome of her Title IX complaint. (ECF No. 88 at 14 – 17). For her *Monell* claim, Plaintiff alleges that Defendants are liable because "Quezada was vested with state power to enforce all YPS policies" and failed to follow up on her complaints of Medina's sexual harassment and "exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe." (*Id.* at 21).

Defendants YPS and Quezada jointly move for summary judgment on both remaining claims, arguing that they did not engage in unlawful retaliation as a matter of law and that Plaintiff cannot establish that any alleged retaliatory conduct resulted from a municipal policy or custom. For the reasons explained below, Defendants' motion is GRANTED.

SpA.8

A. **Section 1983 Retaliation Claim**

"A state employee may bring a retaliation claim under Section 1983 against a supervisor who, acting under color of law, retaliates against him for opposing discrimination in the terms of his employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015). The elements of a Section 1983 retaliation claim based on an equal protection violation mirror those under Title VII. *Vega*, 801 F.3d at 91. At summary judgment, Title VII retaliation claims are evaluated under the three step *McDonnell Douglas* burden-shifting analysis. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

First, Plaintiff must establish a prima facie case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Lenzi v. Systemax, Inc*., 944 F.3d 97, 112 (2d Cir. 2019). The Plaintiff's burden at this first step is "de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164. Title VII retaliation claims must be proved according to but-for causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (*quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

Second, "if the plaintiff sustains this initial burden, a presumption of retaliation arises," and the "defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164. Third, the burden shifts back to Plaintiff to establish that the non-retaliatory reason offered by Defendant is a mere pretext for retaliation.

SpA.9

*Kirkland v. Cablevision Sy*s., 760 F.3d 223, 225 (2d Cir. 2014); *Valentine v. HNTB Corp.*, No. 21

CIV. 4616 (JPC), 2023 WL 2752121, at *6 (S.D.N.Y. Mar. 31, 2023).  To demonstrate that an

employer's explanation is pretextual, the plaintiff must show that "retaliation was a 'but-for'

cause of the adverse action."  *Zann Kwan*, 737 F.3d at 845; *Henderson v. Sikorsky Aircraft

Corp.*, 590 F. App'x 9, 10 (2d Cir. 2014).

Here, Defendants move for summary judgment on Plaintiff's retaliation claim, arguing

that she cannot establish that she suffered a materially adverse employment action or that there

was any causal relationship between her protected activity and the alleged adverse employment

action.  (ECF No. 83 at 10 – 18).  The Court addresses each of these arguments below.

1. Plaintiff cannot establish that she suffered a materially adverse employment action as
   a matter of law.

Adverse employment actions in the context of retaliation claims must be "materially

adverse," meaning that they might have dissuaded a reasonable worker from making or

supporting a charge of discrimination.  *De Jesus-Hall v. New York Unified Ct. Sys.*, 856 F. App'x

328, 331 (2d Cir. 2021) (summary order); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663

F.3d 556, 568 (2d Cir. 2011).  "Trivial harms"—i.e., "those petty slights or minor annoyances

that often take place at work and that all employees experience"—are not materially adverse.

*Tepperwien*, 663 F.3d at 568.  Plaintiff claims that she suffered materially adverse employment

actions because (1) she was transferred to Cesar Chavez where she had to perform more job

duties with different hours; (2) Defendants failed to investigate her various complaints; and (3)

Defendants failed to promptly inform her of the outcome of her Title IX complaint.  (ECF No. 88

at 14 – 17).  But even if the Court accepts all these allegations as true, they still do not rise to the

level of a materially adverse employment action as a matter of law.

SpA.10

First, Plaintiff's transfer to Cesar Chavez cannot be considered a materially adverse employment action.  Plaintiff asserts that she now must perform the duties of a Data Clerk I in addition to those of a Clerk I-Spanish Speaking, and that her new hours cause her to pay for additional childcare.  (ECF No. 88 at 15).  But reassignment of job duties is not automatically considered a materially adverse employment action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006).  Indeed, "[t]he courts in this Circuit have generally declined to find that transfers (or denials of transfers) amount to adverse employment actions, even in the context of a retaliation claim, where the action results merely in 'an inconvenience, such as an increased commute or unfavorable hours.'"  *Ray v. New York State Ins. Fund*, No. 16 CIV. 2895 (NRB), 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018).

Here, the undisputed evidence shows that Plaintiff's official job responsibilities and work hours at her old and new job are substantially the same.  Plaintiff claims that she now must perform the role of a "Data Clerk I," on top of her old job responsibilities as a "Clerk I-Spanish speaking."  (ECF No. 88 at 15).  But the written job descriptions for these two positions are identical except that a "Clerk I-Spanish Speaking" must also translate Spanish.  (ECF No. 92 at 2 – 3).  In addition, Plaintiff's new job hours differ by only thirty minutes in the morning and afternoon, and her salary, pay increases, and benefits did not change.  (ECF No. 92 at 2 – 4).  Given these undisputed facts, it is hard to see how a reasonable worker might be dissuaded from making or supporting a charge of discrimination because they were transferred to a new position with virtually the same official responsibilities, salary, benefits, and hours as their old one.  Indeed, in this case, the undisputed evidence shows that Plaintiff herself was not so dissuaded.  For instance, after her transfer, Plaintiff admits that she emailed the Deputy Commissioner of HR, Theresa Forget, asking for a meeting; she spoke with Voorheis (the EEO coordinator)

SpA.11

regarding the dissemination of her Title IX Complaint; and she messaged Voorheis at least twice stating that she wanted to provide more information. (ECF No. 92 at 8 – 10). In fact, Plaintiff's May 21, 2019, letter to Voorheis specifically said that she now felt comfortable making such charges *because* of her transfer: "I feel safe addressing it now that I am no longer at Robert C. Dodson." (ECF No. 82-15 at 2; *see also* ECF No. 92 at 9). Then, on November 19, 2019, Plaintiff wrote to Voorheis, identifying Medina and Guzman by name, and stating that she would like to say more about them both. (ECF No. 92 at 10).

It is true that Plaintiff alleges that her change in work hours (however small), now requires her to pay more childcare expenses. (ECF No. 88 at 11). As the Supreme Court explained in *Burlington*, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." 548 U.S. at 71. Indeed, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Burlington*, 548 U.S. at 69. Yet, the circumstances of this case, when judged from the perspective of a reasonable person in Plaintiff's position, still lead the Court to the same conclusion. During the first week of her new job, Plaintiff requested that her work hours be changed to accommodate her childcare needs. (ECF No. 92 at 2). Her request was accommodated almost immediately, as the principal changed her hours that same week. (*Id.* at 2). These undisputed facts, coupled with Plaintiff's continued reporting of misconduct after her transfer, indicate that her transfer was not an adverse employment action that might dissuade a reasonable worker from making a sexual harassment complaint.[14] *Tepperwien*, 663 F.3d at 572

---

[14] The Court notes that Plaintiff claims that she was "dissuaded from complaining further" by, for example, not filing an EEOC charge or a subsequent Title IX complaint against Medina and Guzman. (ECF No. 88 at 15).

SpA.12

("Indeed, while the test is an objective one, it is relevant that Tepperwien himself was not deterred from complaining—he complained numerous times"); *De Jesus-Hall*, 856 F. App'x at 331 (holding that a transfer was not an adverse employment action that would dissuade a reasonable worker from making a complaint of discrimination and noting that Plaintiff herself made a subsequent complaint months after her transfer).

Second, Defendants' alleged failure to investigate her various complaints, including her sexual harassment allegations against Medina and Guzman and the improper dissemination of her Title IX complaint, also do not constitute materially adverse employment actions. To be sure, Plaintiff's allegations of harassment against Medina and Guzman are serious ones that raise serious questions about the work environment at Dodson. But the remaining claims here are not about whether Plaintiff suffered such harassment, but whether YPS's and Quezada's alleged failure to investigate her allegations give rise to a triable claim for retaliation. The Second Circuit's analysis in *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010), is instructive here. In the context of a Section 1981 employment retaliation case,[15] the Court found that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 721 – 722. The Court explained that "[a] contrary rule could have odd consequences. A person not in fact discriminated against could complain of discrimination nonetheless. If the miffed accused employer were, because of his or her anger, to decline to investigate what was in fact a false claim, the employee might have a

_____

Plaintiff claims that she "did not raise complaints about Medina until this instant action." (*Id.*) However, Plaintiff did complain to Voorheis after her transfer in both May and November 2019, and her November message identified Medina by name and stated that she had information to provide to Voorheis about her. (ECF No. 92 at 10).

[15] Section 1981 claims, like Title VII claims, are evaluated under the three step *McDonnell-Douglas* burden shifting framework. *Fincher*, 604 F.3d at 720.

SpA.13

viable suit for retaliatory failure to investigate. We do not think that to be the law." *Id.* The same logic applies here. To the extent Plaintiff argues that Defendants failed to investigate her allegations in retaliation for her bringing those same allegations, the Second Circuit does not classify that as an adverse employment action. *Fincher*, 604 F.3d at 721.

Plaintiff also appears to allege – however obliquely – that Defendants failed to investigate her complaints against Medina and Guzman (and her complaint about the improper dissemination of her Title IX complaint) in retaliation for her *earlier* complaint about Cassano.[16] But this too fails to rise to the level of an adverse employment action.[17] Again, the key issue is whether Defendants' failure to investigate the allegations against Medina and Guzman might dissuade a reasonable worker from making or supporting a charge of sexual harassment. *See Daniel v. ABM Indus., Inc.*, No. 16-CV-1300 (RA), 2017 WL 1216594, at *12 (S.D.N.Y. Mar. 31, 2017) (finding failure to investigate did not constitute adverse employment action because it would not dissuade a reasonable worker from making or supporting a charge of discrimination). That inquiry requires that Plaintiff suffer some demonstrable harm from Defendants' failure to investigate. *Id.* As Judge Abrams noted in *Daniel*, cases where failures to investigate were found to be adverse employment actions were "exceptional," and involved Plaintiffs who suffered a high level of demonstrable harm. *See id.* (collecting cases). For example, in *Rochon v. Gonzalez*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006), the court found that the plaintiff – an FBI agent – suffered an adverse employment action where he alleged that the FBI failed to investigate a death threat due to his earlier complaint of discrimination. 438 F.3d at 1219-20.

---

[16] Plaintiff briefly mentions that "but-for her transfer requests and initial complaints about Cassano, she…would not have had her complaints ignored by HR." (ECF No. 88 at 18).

[17] In *Fincher*, the Second Circuit noted that a failure to investigate might be an adverse employment action if it is in retaliation for some separate protected act by the plaintiff. 604 F.3d at 722. But the Second Circuit left open the question of whether an employer's failure to investigate a complaint in retaliation for the filing of a prior complaint could constitute an adverse employment action.

14

Likewise, in *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 349 (6th Cir. 2008), the court held that an employer's failure to investigate allegations that Plaintiff's car was set on fire by a co-worker could constitute an adverse employment action.  517 F.3d at 349.

No such demonstrable harm exists here, even after all inferences are drawn in Plaintiff's favor.  It is undisputed that Plaintiff filed a formal Title IX complaint against Cassano on April 11, 2019 (ECF No. 92 at 5) and that Quezada transferred Cassano out of Dodson the next day. (*Id.* at 5, 6).  Plaintiff also voluntarily requested a transfer to Cesar Chavez on April 17, 2019, after conveying her allegations to Turner (*id.* at 3, 7 – 8, 15), and her transfer request was granted just six days later.  (*Id.* at 7 - 8).  After Plaintiff's transfer, she did not face any further contact with Medina (*id.* at 8), and she tried to report her allegations against Medina and Guzman because she said that she now felt safe doing so.  (*Id.* at 3, 8 - 9). Although Voorheis delayed notifying Plaintiff about the completion of his investigation into Cassano, there is no dispute that he did conduct the investigation and ultimately found Plaintiff's allegations founded.  (*Id.* at 10). And by the time Voorheis reported the results of his investigation to Plaintiff in November 2019, Medina had resigned from her position as Principal in August 2019.  (ECF No. 92 at 4, 10).

At worst, Defendants failed to fully investigate Plaintiff's complaints against Medina and Guzman after she conveyed them to YPS officials.  But Plaintiff can point to no demonstrable harm that worsened the conditions of her employment or otherwise adversely affected her because of those failures.  Considering the facts of Plaintiff's case in context, no reasonable juror could find that a reasonable worker might be dissuaded from making a future complaint as a result of Defendants' failures to investigate.  Indeed, Plaintiff herself did report sexual harassment discrimination to YPS officials in the months that followed her transfer, including messages sent to Voorheis on May 21, 2019, and November 19, 2019.  (ECF No. 92 at 10, 21).

SpA.15

Third, Defendants' alleged failure to promptly inform her of the outcome of her Title IX complaint is not a materially adverse employment action. Plaintiff alleges that she suffered a materially adverse employment action when Voorheis failed to promptly inform her of the outcome of her Title IX complaint against Cassano. (ECF No. 88 at 16 – 17). But even if this delay were intentional, there is no way to view this action as likely to dissuade a reasonable worker from making a future complaint. As noted above, Plaintiff's Title IX complaint was investigated, and her allegations were considered founded. (ECF No. 92 at 10). After she filed her Title IX complaint, Turner met with Quezada, who then granted Plaintiff's transfer request. (*Id.* at 7 – 8). Also, in response to Plaintiff's Title IX complaint, the person Plaintiff complained about was transferred to another school. (*Id.* at 5, 6). It is hard to see how getting delayed notice about the positive outcome of Plaintiff's Title IX complaint could be viewed as a materially adverse employment action.

The logic applied by the Second Circuit in *Fincher* applies with equal force here. In that case, the Second Circuit found that an employer's failure to investigate a complaint could not be considered an adverse employment action taken in retaliation for the filing of that same complaint. *Fincher*, 604 F.3d at 721. By that same logic, Defendants' failure to inform Plaintiff promptly about the outcome of their investigation into her complaint cannot be considered an adverse employment action taken in retaliation for the filing of that same complaint. Otherwise, a plaintiff could make an unmeritorious complaint, and if they are not promptly informed of the investigative results, then bring a meritorious retaliation action. *Fincher*, 604 F.3d at 721 ("If the miffed accused employer were, because of his or her anger, to decline to investigate what was in fact a false claim, the employee might have a viable suit for retaliatory failure to investigate. We

SpA.16

do not think that to be the law"). Indeed, Plaintiff cites no case law in which a court deemed a failure to inform a complainant of the results of her complaint an adverse employment action.

2. <u>Plaintiff cannot establish a causal relationship between her protected activity and the alleged adverse employment action of her transfer to Cesar Chavez.</u>

Plaintiff's retaliation claim based on her transfer to Cesar Chavez also fails because she cannot establish that retaliation was the but-for cause of her transfer.[18] As noted above, but-for causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Zann Kwan*, 737 F.3d at 845 (*quoting Nassar*, 570 U.S. at 360). Here, the undisputed evidence shows that Plaintiff was transferred because she asked to be transferred, not because of retaliation for making complaints. Indeed, Plaintiff admits that "she was transferred, *at her request*, to Cesar Chavez," and that she "was *voluntarily* transferred." (ECF No. 92 at 3, 8) (emphasis added). Thus, even if Plaintiff can establish that her transfer to Cesar Chavez was a materially adverse employment action, the undisputed evidence shows that she was not transferred in retaliation for engaging in a protected activity.[19]

## B. *Monell* Claim[20]

A plaintiff can prove *Monell* liability by establishing that (1) a municipal policy or custom (2) caused them to endure (3) the deprivation of a constitutional right. *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). Here, Plaintiff claims that Defendants

---

[18] The parties briefly quibble over the extent to which temporal proximity can be considered to support Plaintiff's claim that her transfer to Cesar Chavez was retaliatory. (ECF Nos. 88 at 18; 91 at 11). However, for the reasons stated *supra*, it is undisputed that Plaintiff was transferred because she asked to be transferred, thus evaluating temporal proximity to establish causation is unnecessary.

[19] The Court declines to address but-for causation with respect to Plaintiff's other arguments (i.e. that Defendants failed to properly investigate her complaints), which fail for the reasons discussed above.

[20] Plaintiff's complaint pleads the *Monell* claim against the "Municipal Defendants." (ECF No. 1 at 15). As an initial matter, the Court questions whether the language "Municipal Defendants" includes Quezada, because he is not a municipality. But viewing all allegations in the complaint in the light most favorable to Plaintiff, the Court overlooks this inartful pleading to address the merits of Plaintiff's claim, which fails for other reasons.

are subject to *Monell* liability because "Quezada was vested with state power to enforce all YPS policies" and failed to follow up on her complaints of Medina's sexual harassment. (ECF No. 88 at 21). Plaintiff also claims that Quezada "exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe." (*Id.*) Defendants move for summary judgment, arguing that Plaintiff cannot establish that any alleged retaliatory conduct stemmed from a municipal policy or custom. (ECF No. 83 at 18 – 20). As explained below, the Court grants Defendants' motion and dismisses Plaintiff's *Monell* claim as a matter of law.

1. <u>Plaintiff cannot demonstrate the deprivation of a constitutional right on which *Monell* liability may be based</u>.

To establish *Monell* liability, there must be a deprivation of a constitutional right on which such liability is based. *Agosto*, 982 F.3d at 97. Here, the Court has now dismissed Plaintiff's one remaining Section 1983 retaliation claim against both YPS and Quezada. And the allegations that give rise to Plaintiff's *Monell* claim are the same as those underlying her now dismissed claim—that YPS and Quezada failed to follow up on her complaints of Medina's sexual harassment. Without liability on Plaintiff's underlying retaliation claim, Plaintiff has not demonstrated the deprivation of any constitutional right by either YPS or Quezada.

In addition, if liability is not found for an individual employee's actions (in this case, Quezada), then YPS (as the municipality) cannot be found liable for a related *Monell* claim. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). In other words, if a Plaintiff cannot establish her underlying retaliation claim against an individual defendant, then the related *Monell* claims cannot proceed as a matter of law. *See Lax v. City Univ. of New York*, No. 20-3906-CV, 2022 WL 103315, at *3 (2d Cir. Jan. 11, 2022) (summary order) ("Because he has failed to establish individual liability on his discrimination, retaliation, and hostile work environment

18

claims, Lax's claims against CUNY under Monell fail as a matter of law") (*citing Heller*, 457

U.S. at 799); *Wright v. City of Syracuse*, 611 F. App'x 8, 12 (2d Cir. 2015) (summary order).

It is true that "under *Monell*, municipal liability for constitutional injuries may be found

to exist even in the absence of individual liability, at least so long as the injuries complained of

are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cty.

Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). But here, the only actions on which

Plaintiff bases her *Monell* claim are those of Quezada, who she alleges failed to follow up on her

complaints of Medina's sexual harassment (ECF No. 88 at 21), and "exhibited a deliberate

indifference when he failed to inquire with Plaintiff further about what was making her feel

unsafe." (*Id*.) Thus, Plaintiff has presented no facts that she suffered a constitutional injury

caused by anyone who was not named as an individual defendant. As such, Plaintiff fails to

make out a claim for *Monell* liability against YPS and Quezada as a matter of law.

Plaintiff still argues that she "was subjected to deprivation of her Constitutional rights by

Quezada because he 'exhibited deliberate indifference…by failing to act on information

indicating that unconstitutional acts were occurring.'" (ECF No. 88 at 22, *quoting Littlejohn v.

City of N.Y.*, 795 F.3d 297, 314 (2d. Cir. 2015)). Thus, Plaintiff appears to suggest that

Quezada's "deliberate indifference" somehow constitutes a separate deprivation of her

constitutional rights, independent of her Section 1983 retaliation claim. But this argument fails.

Judge Briccetti already dismissed claims against Quezada based on Plaintiff's argument that

"Quezada exhibited deliberate indifference by failing to act on information indicating that

unconstitutional acts were occurring." (ECF No. 82-19 at 26 – 27).[21] In that same ruling, the

Court noted that Plaintiff "cites no case law in support of her contention that Quezada had a duty

---

[21] Referring to the .pdf page number.

SpA.19

to investigate her complaint further or that his failure to do so was somehow discriminatory."
(*Id.*)  Because the Court has already found that Quezada cannot be liable for exhibiting deliberate
indifference to Plaintiff for failing to investigate or following up on her complaints (albeit in the
context of her discrimination and hostile work environment claims), it necessarily follows that
Quezada cannot be liable for *Monell* liability based on those same allegations.

> 2. Plaintiff cannot identify any municipality or custom that gave rise to the alleged
> retaliatory conduct.

Even assuming Plaintiff could make out a claim for some deprivation of a constitutional
right, separate from those already dismissed, Plaintiff's claim still identifies no municipal policy
or custom that gave rise to the alleged retaliatory conduct.  To establish a municipal policy or
custom, "[a] school district's liability under *Monell* may be premised on any of three theories: (1)
that a district employee was acting pursuant to an expressly adopted official policy; (2) that a
district employee was acting pursuant to a longstanding practice or custom; or (3) that a district
employee was acting as a 'final policymaker.'"  *Hurdle v. Bd. of Educ. of City of New York*, 113
F. App'x 423, 424–25 (2d Cir. 2004) (summary order).  Here, the parties offer no evidence that
Quezada's alleged liability for failing to investigate Plaintiff's sexual harassment allegations
stems from an expressly adopted policy or a longstanding practice or custom.  In fact, it appears
that YPS has an express policy against sexual harassment in the workplace, along with grievance
procedures for resolution of complaints.  (ECF No. 82-16).  Thus, whether Quezada acted
pursuant to a municipal policy or custom turns on whether Quezada acted as a final
policymaker.[22]

---

[22] "As with other questions of state law relevant to the application of federal law, the identification of those officials
whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved
by the trial judge before the case is submitted to the jury."  *Hurdle*, 113 F. App'x at 425 (*quoting Jett v. Dallas
Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

SpA.20

To begin, it is doubtful that a single decision not to investigate an individual employee's allegations of sexual harassment can constitute a municipal policy or custom. This seems particularly true here, where there is evidence of a municipal policy that says the "district will promptly investigate all complaints of sexual harassment, either formal or informal, verbal or written." (ECF No. 82-16 at 4).[23] In other words, in this case, a single decision not to investigate an individual employee's allegations appears to be *against* municipal policy, not in furtherance of it. Indeed, in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Supreme Court noted that "'official policy' often refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." 475 U.S. at 480. Yet it is also true that a single action taken by a municipality may be sufficient to expose it to liability. *Id*. at 481 ("where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("It is not necessary, therefore, for plaintiffs to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability.")

Ultimately, "municipal liability under Section 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. Thus, even assuming the decision not to investigate one employee's sexual harassment allegations constitutes a municipal policy, the Court would still

---

[23] Referring to the .pdf page number.

21

SpA.21

need to find that Quezada is a "final policymaker" about whether and when to conduct such investigations. *Compare Hurdle*, 113 F. App'x 423, 427 (2d Cir. 2004) (summary order) ("Even if [Superintendent] Romandetto was the *decisionmaker* with regard to Hurdle's transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers").

Whether a government official "has final policymaking authority is a question of state law." *Hurdle*, 113 F. App'x at 425 (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). Neither party identifies any relevant authority under New York law that describes who has explicit authority to set policy for sexual harassment investigations.[24] More generally, Section 2566 of the New York Education Law governs the duties of Superintendents, and states that the Superintendent shall possess certain powers and duties "subject to the by-laws of the board of education." N.Y. Ed. Law § 2566. Although New York Education law gives the Superintendent the power "[t]o enforce all provisions of law and all rules and regulations," N.Y. Ed. Law § 2566(2), those powers remain "under the direction of the board of education." *Id.* Section 2566(6) further states that the Superintendent shall "report to said board of education violations of regulations and cases of insubordination, and to suspend an associate, assistant, district or other superintendent, director, supervisor, expert, principal, teacher or other employee until the next regular meeting of the board, when all facts relating to the case shall be submitted to the board for its consideration and action." N.Y. Ed. Law § 2566(6). At most, this statute says that the Superintendent has a duty to enforce regulations and report violations. But it says

---

[24] Plaintiff cites to case law, such as *Agosto v. New York City Department of Education*, 982 F.3d 86 (2d Cir. 2020), that discusses the power of the New York City Chancellor of Schools. (ECF No. 88 at 19 – 21). But the New York State Education Law distinguishes the New York City Chancellor of Schools as a different position from other school superintendents and promulgates different powers and authority for the positions via separate statutes. *Compare* N.Y. Ed. Law §2566 & § 2590-h.

SpA.22

nothing about whether the Superintendent has final policymaking authority about such violations, or about sexual harassment investigations in particular.

If anything, Section 2566 suggests that it is the Board of Education that sets final policy, not the Superintendent.[25]  As noted above, the Superintendent's power to enforce "rules and regulations" is done "under the direction of the board of education" to whom the Superintendent must "report" violations and "submit" all facts "for its consideration and action."  N.Y. Ed. Law §§ 2566(2), (6).  Because the Superintendent is statutorily required to report rule violations to the Board and submit facts to them for their "consideration and action," this indicates that the Superintendent cannot have "final" policymaking authority about investigating rule violations. Thus, although a Superintendent may be a decision-maker, with the power to enforce and implement policies, the Board of Education is the final policymaker.  *See, e.g., Jones v. Bay Shore Union Free Sch. Dist.*, 170 F. Supp. 3d 420, 438 (E.D.N.Y.), aff'd on other grounds, 666 F. App'x 92 (2d Cir. 2016) (holding that under N.Y. Ed. Law § 1711 – a statute similar to § 2566 but applicable to Union Free School Districts – a Superintendent in a free speech employment discrimination case may be a decisionmaker, but the Board of Education is the final policymaker).

Indeed, even if Quezada made a final decision not to investigate Plaintiff's allegations, that still does not mean that Quezada was a final policymaker. *Hurdle*, 113 F. App'x at 427.[26]

---

[25] The YPS policies identified by the Defendant similarly state that "[p]olicy adoption is the function of the Board" (ECF No. 82-17, Policy 2410, citing "Formulation, Adoption, Amendment and Suspension of Policies"), and that the "Board of Education is the legally constituted body, politic and corporate, charged with the responsibility of establishing policy for the maintenance and operation of the City School District of the City of Yonkers." (ECF No. 82-17, policy 2110, citing School Board Powers and Duties).

[26] Plaintiff incorrectly states that the Second Circuit "equat[es] a final decisionmaker with a final policymaker." (ECF No. 19, *citing Friend v. Gasparino*, 61 F. 4th 77, 99 (2d Cir. 2023)).  In fact, *Friend* states the exact opposite: "*Were we* to 'equat[e] a final decisionmaker with a final policymaker,' we 'would effectively impose respondeat superior liability—making the municipality liable for the conduct of its employees—in violation of *Monell.*'" *Friend*, 61 F.4th at 95 (*quoting Agosto*, 982 F.3d at 91) (emphasis added).  The Second Circuit declined to do so.

SpA.23

The Second Circuit's decision in *Hurdle* is particularly instructive.  In that case, the Court held that even if a Superintendent were a decisionmaker about an employee's involuntary transfer, that does not establish that the Superintendent "had the authority to set the policy authorizing involuntary employee transfers." *Hurdle*, 113 F. App'x at 427.  Likewise, even if Quezada were the final decisionmaker about whether to investigate Plaintiff's allegations of sexual harassment, that does not establish that he had the authority to set policy for investigating sexual harassment.  Indeed, as discussed above, Section 2566 suggests that it is the Board of Education that sets final policy, not the Superintendent.

**<u>CONCLUSION</u>**

For the reasons stated above, Defendants' joint motion for summary judgment is GRANTED and the Clerk of Court is directed to close out ECF Nos. 81.

**SO ORDERED.**

DATED:      White Plains, New York
            March 29, 2024

_____
VICTORIA REZNIK
United States Magistrate Judge

SpA.24

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GISSELLE VASQUEZ,

                         Plaintiff,                    21 **CIVIL** 4620 (VR)

        -against-                                    **JUDGMENT**

YONKERS PUBLIC SCHOOL DISTRICT,
DR. EDWIN M. QUEZADA.

                         Defendants.
------------------------------------------------------------------------X


        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion & Order dated March 29, 2024, Defendants' joint motion for

summary judgment is GRANTED.

**Dated:** New York, New York
        March 29, 2024


                                        **RUBY J. KRAJICK**
                                        **Clerk of Court**


                        **BY:**
                                _____
                                    **Deputy Clerk**


SpA.25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GISSELLE VASQUEZ

GISSELLE VASQUEZ

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

YONKERS PUBLIC SCHOOL DISTRICT, EVELINA MEDINA and DR. EDWIN M. QUEZADA, in their personal and professional capacities

YONKERS PUBLIC SCHOOL DISTRICT, EVELINA MEDINA and DR. EDWIN M. QUEZADA, in their personal and professional capacities

(List the full name(s) of the defendant(s)/respondent(s).)

7:21 CV 04620 ( VR )( )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: GISSELLE VASQUEZ

GISSELLE VASQUEZ

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the ☑ judgment ☑ order entered on: 04/01/2024, 03/29/2024

(date that judgment or order was entered on docket)

that: SUMMARY JUDGMENT in favor of Defendants

SUMMARY JUDGMENT in favor of Defendants

(If the appeal is from an order, provide a brief description above of the *decision in the order*.}

04/29/2024

Dated

*Christopher J. Berlingieri*

Signature*

Christopher J. Berlingieri, Esq.(CB 1988)

Name (Last, First, MI)

244 5th Ave, Suite F276   New York   NY   10001

Address                          City          State          Zip Code

347-766-5185.                          cjb@nyctlaw.com

Telephone Number                          E-mail Address (if available)

Attorney on behalf of Gisselle Vasquez

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

**New York Consolidated Laws, Education Law - EDN § 2566. Powers and duties of superintendent of schools**

Current as of January 01, 2021 | Updated by FindLaw Staff

The superintendent of schools of a city shall possess, subject to the by-laws of the board of education, the following powers and be charged with the following duties:

1.  To be the chief executive officer of such board and the educational system, and to have a seat on the board of education and the right to speak on all matters before the board, but not to vote.

2.  To enforce all provisions of law and all rules and regulations relating to the management of the schools and other educational, social and recreational activities under the direction of the board of education.

3.  In a city having a population of one million or more, to exercise such administrative and ministerial powers of such board as may be delegated to him by regulation and by-laws of such board in such manner and with the same force and effect as if such powers were given to him by the provisions of the education law.

4.  To prepare the content of each course of study authorized by the board of education.  The content of each such course shall be submitted to the board of education for its approval and, when thus approved, the superintendent shall cause such courses of study to be used in the grades, classes and schools for which they are authorized.

5.  To recommend suitable lists of textbooks to be used in the schools.

6.  To have supervision and direction of associate, assistant, district and other superintendents, directors, supervisors, principals, teachers, lecturers, medical inspectors, nurses, claims auditors, deputy claims auditors, attendance officers, janitors and other persons employed in the management of the schools or the other educational activities of the city authorized by this chapter and under the direction and management of the board of education, except that in the city school districts of the cities of Buffalo, Rochester, and Syracuse to also appoint, within the amounts budgeted therefor, such associate, assistant and district superintendents and all

other supervising staff who are excluded from the right to bargain collectively pursuant to article fourteen of the civil service law; to transfer teachers from one school to another, or from one grade of the course of study to another grade in such course, and to report immediately such transfers to said board for its consideration and action; to report to said board of education violations of regulations and cases of insubordination, and to suspend an associate, assistant, district or other superintendent, director, supervisor, expert, principal, teacher or other employee until the next regular meeting of the board, when all facts relating to the case shall be submitted to the board for its consideration and action.

7.  To have supervision and direction over the enforcement and observance of the courses of study, the examination and promotion of pupils, and over all other matters pertaining to playgrounds, medical inspection, recreation and social center work, libraries, lectures and all other educational activities and interest under the management, direction and control of the board of education.

8.  To issue such licenses to teachers, principals, directors, school psychiatrists, school psychologists, school medical inspectors, school aurists, school psychiatric social workers, school social case workers, research assistants, teacher-clerks, school clerks, clerical assistants, industrial or trade helpers in vocational schools, school librarians, laboratory assistants, placement and investigation assistants, financial assistants, machine shop assistants, tool boys, and other members of the teaching and supervising staff as may be required under the by-laws and regulations of the board of education in cities in which such board requires its teachers to hold qualifications in addition to or in advance of or different from, where such qualifications are not provided by the commissioner, the minimum qualifications required under this chapter.  All such licenses issued prior to the first day of December, nineteen hundred thirty-four, and all appointments made or hereafter made pursuant to such licenses are hereby authorized and validated against any statutory provision, omission, or irregularity, provided the examination for such license was conducted by the board of examiners in accordance with the by-laws and regulations of the board of education, notwithstanding the invalidity of any such by-laws and regulations.  All such licenses issued by the chancellor prior to the effective date 1 of a chapter of the laws of 1990, entitled "AN ACT to amend the education law and the administrative code of the city of New York, in relation to appointment of teaching service

SpA.28

personnel by abolishing the board of examiners in cities having a population of one million or more and to repeal certain provisions of the education law relating thereto" 2 and all appointments made or hereafter made pursuant to such licenses are hereby authorized and validated, notwithstanding any provision of statute or regulation to the contrary. Nothing in this chapter shall affect the rights of persons serving pursuant to appropriate licenses issued prior to the effective date of a chapter of the laws of 1990, entitled "AN ACT to amend the education law and the administrative code of the city of New York, in relation to appointment of teaching service personnel by abolishing the board of examiners in cities having a population of one million or more and to repeal certain provisions of the education law relating thereto" or require them to obtain certifications or licenses not previously required of them.

9. Notwithstanding any inconsistent provision of law, the provisions of subdivision six of this section relating to the transfer of teachers may be modified by an agreement that is collectively negotiated pursuant to the provisions of article fourteen of the civil service law.

**Section 2590-H - [Effective 6/30/2026] Powers and duties of chancellor**

The office of chancellor of the city district is hereby continued. It shall be filled by a person employed by the city board by contract for a term not to exceed by more than one year the term of office of the city board authorizing such contract, subject to removal for cause. The chancellor shall receive a salary to be fixed by the city board within the budgetary allocation therefor. He or she shall exercise all his or her powers and duties in a manner not inconsistent with the policies of the city board. The chancellor shall have the following powers and duties as the superintendent of schools and chief executive officer for the city district, which the chancellor shall exercise to promote an equal educational opportunity for all students in the schools of the city district, promote fiscal and educational equity, increase student achievement and school performance and encourage local school-based innovation, including the power and duty to:

**1.** Control and operate:**(a)** academic and vocational senior high schools until such time as the same may be transferred to the jurisdiction of appropriate community boards pursuant to this article;**(b)** all specialized senior high schools. The special high schools shall include the present schools known as:

The Bronx High School of Science, Stuyvesant High School, Brooklyn Technical High School, Fiorello H. LaGuardia High School of Music and the Arts in the borough of Manhattan, and such further schools which the city board may designate from time to time. The special schools shall be permitted to maintain a discovery program in accordance with the law in effect on the date preceding the effective date of this section; admissions to the special schools shall be conducted in accordance with the law in effect on the date preceding the effective date of this section;

**(c)** all special education programs and services conducted pursuant to this chapter;**(d)** subject to the provisions of section twenty-five hundred ninety-i of this article, devolving powers to the schools, city-wide programs for city-wide services to a substantial number of persons from more than one community district, including transportation; food services; payroll and personnel functions, including pension and retirement services; and enforcement of laws and regulations promoting equal opportunity in employment, access to public accommodations and facilities, equal opportunity in education, and preventing and

SpA.30

addressing unlawful discrimination; provided, however, that a community district may also operate within its district programs which provide similar services otherwise authorized by this article.**2.** Establish, control and operate new schools or programs of the types specified in subdivision one of this section, or to discontinue any such schools and programs as he or she may determine; provided, however, that he shall consult with the affected community board before:**(a)** substantially expanding or reducing such an existing school or program within a community district;**(b)** initially utilizing a community district school or facility for such a school or program;**(c)** instituting any new program within a community district.**3.** Subject to the approval of the city board, develop a plan to provide for the establishment of comprehensive high schools within the city district so that every community district shall have available to its graduates further education and a comprehensive high school. Such plan may provide for the conversion of academic and vocational high schools and may be amended or modified from time to time.**4.** Appoint teacher-aides for the schools and programs under his or her jurisdiction within the budgetary allocation therefor.**5.** Retain jurisdiction over all employees who are required in connection with the performance of duties with respect to the design, construction, operation and maintenance of all school buildings in the city school district. Such employees shall have all rights accorded them under the provisions of the civil service law, including manner of appointment, classification, promotion, transfer and removal including an opportunity to be heard provided, however, that each custodian shall be responsible for the performance of his duties to the principal of the school who shall be responsible to the district superintendent.**6.** Employ or retain counsel subject to the powers and duties of the corporation counsel of the city of New York to be his or her attorney and counsel pursuant to subdivision a of section three hundred ninety-four of the New York city charter; provided, however, that in actions or proceedings between the city board or the chancellor and one or more community boards, the city board or the chancellor shall be represented by the corporation counsel of the city of New York.**7.** To continue existing voluntary programs or to establish new programs under which students may choose to attend a public school in another community district.**8.** Promulgate minimum clear educational standards, curriculum requirements and frameworks, and mandatory educational objectives applicable to all schools and programs throughout the city district, and examine and evaluate periodically all such schools and programs with respect to**(i)** compliance with such educational standards and other

requirements, and **(ii)** the educational effectiveness of such schools and programs, in a manner not inconsistent with the policies of the city board.**9.** Furnish community boards and the city board periodically with the results of such examinations and evaluations and to make the same public.**10.** Require each community superintendent to make an annual report covering all matters relating to schools under the district's jurisdiction including, but not limited to, the evaluation of the educational effectiveness of such schools and programs connected therewith.**11.** Require such community board or superintendent to make such number of periodic reports as may be necessary to accomplish the purposes of this chapter.**13.** Perform the following functions throughout the city district; provided, however, that the chancellor and any community board may agree that any such function may be appropriately performed by the community board with respect to the schools and programs under its jurisdiction:**(a)** Technical assistance to community districts and schools;**(b)** Such warehouse space on a regional basis as he or she determines to be necessary or appropriate after consultation with the community superintendents;**(c)** Purchasing services on a city-wide, regional or community district basis subject to subdivision thirty-six of this section;**(d)** Reinforce and foster connections to institutions of higher education to promote student achievement.**14.** Develop and furnish pre-service and in-service training programs for principals and other employees throughout the city district. In addition, the chancellor shall prepare and annually update a training plan for participating parents, and school personnel, which shall include, at minimum, such training as may be required for exercise of their responsibilities, full participation and compliance with the provisions of this section. The chancellor shall, in addition, within amounts appropriated, allocate sufficient funds directly and to the superintendents for teacher and principal training to meet identified needs for school improvement.**15.** Promote the involvement and appropriate input of all members of the school community pursuant to the provisions of this article, including parents, teachers, and other school personnel, including:**(a)** establishing a parents' association or a parent-teachers' association in each school under the chancellor's jurisdiction; and ensuring that the districts do the same;**(b)** pursuant to a plan prepared in consultation with associations of parents, and representatives of teachers, supervisors, paraprofessionals and other school personnel within the city district, and promulgated no later than January thirty-first, nineteen hundred ninety-eight, (i) taking all necessary steps to ensure that no later than October first, nineteen hundred ninety-nine, the city district and the community

districts are in full compliance, and remain in compliance
thereafter, with state and federal law and regulations
concerning school-based management and shared decision-making,
including section 100.11 of the commissioner's regulations, in a
manner which balances participation by parents with
participation by school personnel in advising in the decisions
devolved to schools pursuant to sections twenty five hundred
ninety-i and twenty-five hundred ninety-r of this article, and
(ii) pursuant to such plan providing for appropriate training to
any parent and school personnel who participate in the school-
based management and shared decision-making process;
and**(c)** developing, in consultation with associations of parents
in the city district, and implementing no later than October
first, nineteen hundred ninety-eight, a parental bill of rights
which provides for, at minimum:**(i)** reasonable access by parents,
persons in parental relation and guardians to schools,
classrooms, and academic and attendance records of their own
children, consistent with federal and state laws, provided that
such access does not disrupt or interfere with the regular
school process;**(ii)** the rights of parents, persons in parental
relation and guardians to take legal action and appeal the
decisions of the school administration, as authorized by
law;**(iii)** the right of parents, persons in parental relation and
guardians to have information on their own child's educational
materials;**(iv)** access to and information about all public
meetings, hearings of the chancellor, the city board, the
community superintendents, the community boards, and the
schools; and**(v)** access to information regarding programs that
allow students to apply for admission where appropriate to
schools outside a student's own attendance zone.

The chancellor shall by rule or regulation provide for the
involvement including membership, in any parents' association or
parent-teacher association established pursuant to this
subdivision, of a grandparent who is in parental relation to a
child who attends a school within the jurisdiction of the
community school district. For purposes of this subdivision, a
grandparent shall be considered to be in parental relation to a
child when such grandparent has assumed care of such child
because such child's parents are not available due to death,
imprisonment, mental illness, living outside the state,
abandonment of the child, or other circumstances. A
determination of whether a grandparent is in parental relation
to a child shall be based upon the individual circumstances
surrounding guardianship and custodial care of such child.

SpA.33

**16.** Promulgate such rules and regulations as he or she may determine to be necessary or convenient to accomplish the purposes of this act, not inconsistent with the provisions of this article and the policies of the city board.**17.** Possess those powers and duties described in section twenty-five hundred fifty-four of this chapter, the exercise of which shall be in a manner not inconsistent with the provisions of this article and the policies of the city board.**18.** Possess those powers and duties contained in section nine hundred twelve of this chapter and those provisions of article fifteen thereof which relate to non-public schools, those powers and duties contained in section five hundred twenty-two of the New York city charter and those powers and duties contained in article seventy-three of this chapter, the exercise of which shall be in a manner not inconsistent with the provisions of this article and the policies of the city board.**19.** Delegate any of his or her powers and duties to such subordinate officers or employees as he or she deems appropriate and to modify or rescind any power and duty so delegated.**20.** Ensure compliance with qualifications established for all personnel employed in the city district, including the taking of fingerprints as a prerequisite for licensure and/or employment of such personnel. Every set of fingerprints taken pursuant to this subdivision shall be promptly submitted to the division of criminal justice services where it shall be appropriately processed. Furthermore, the division of criminal justice services is authorized to submit the fingerprints to the federal bureau of investigation for a national criminal history record check.**21.** Perform the functions of the bureau of audit throughout the city district, including ensuring compliance with subdivisions thirty-six and thirty-seven of this section.**22.** Establish uniform procedures for record keeping, accounting and reporting throughout the city district, including pupil record keeping, accounting and reporting.**23.** Develop an educational facilities master plan, and revisions thereto, as defined in section twenty-five hundred ninety-o of this article.**24.** Develop and implement a five-year educational facilities capital plan, and amendments thereto, as defined in section twenty-five hundred ninety-p of this article. The chancellor shall also appoint a person, who reports directly to the chancellor or his or her designee, to assist in the development and implementation of such plan and amendments thereto and to oversee the school buildings program.**25.** On the chancellor's own initiative, or at the request of a community superintendent, transfer a principal employed by a community school district pursuant to an agreement with the employee organization representing such principals. The chancellor shall establish a procedure for consulting with affected parents to

explain any such transfer. Consistent with section twenty-five hundred ninety-i of this article, including without limitation subdivision three thereof, and subdivision one thereof with respect to the rights and obligations of a school to which a principal is transferred, in addition to any other law providing for the transfer of principals, the chancellor also may cause the transfer or removal of principals for persistent educational failure, conflicts of interest, and ethics violations, and may require principals to participate in training and other remedial programs to address identified factors affecting student achievement and school performance.**26.** Establish educational and experience qualifications and requirements for all custodial positions including, but not limited to, custodians and custodial engineers and develop standards for evaluating the performance of all such individuals, subject to approval of the city board. Such performance standards shall include, but not be limited to: the cleanliness of facilities; adequacy and timeliness of minor repairs; maintenance of good working order of facilities and grounds; general facilities improvement; and emergency services. The chancellor shall promulgate regulations setting forth the respective responsibilities of the district plant manager, which shall include regular consultation and ongoing reports to the community superintendent, and the principal of each school for evaluating the performance of the custodial employees assigned to his or her school, in accordance with such performance standards, and such performance evaluations shall be given dominant weight in any decision for the purposes of: advancement; continued employment; building transfers; and other performance incentives. The responsibility of the principal of each school in the evaluation of custodial employees may be a matter for collective bargaining with collective bargaining representatives for principals.**27.** Develop, in conjunction with each community superintendent, a plan for providing access to school facilities in each community school district, when not in use for school purposes, in accordance with the provisions of section four hundred fourteen of this chapter. Such plan shall set forth a reasonable system of fees not to exceed the actual costs and specify that no part of any fee shall directly or indirectly benefit or be deposited into an account which inures to the benefit of the custodians or custodial engineers.**28.** Establish, subject to the approval of the city board, a publicly-inclusive process for the recruitment, screening and selection of district superintendent candidates.**29.** Promulgate regulations, subject to the approval of the city board, establishing educational, managerial, and administrative qualifications, performance record criteria, and performance standards for the positions of

superintendent and principal.**30.** Select a community superintendent from candidates recommended by community boards, based upon compliance with the procedures for selection required by subdivision twenty-eight of this section, the qualifications required by subdivision twenty-nine of this section, and consistent with a model contract developed by the chancellor.**30-a.** Remove a community superintendent who fails to comply with the provisions of subdivision two of section twenty-five hundred ninety-f of this article.**31.** Intervene in any district or school which is persistently failing to achieve educational results and standards approved by the city board or established by the state board of regents, or has failed to improve its educational results and student achievement in accordance with such standards or state or city board requirements, or in any school or district in which there exists, in the chancellor's judgment, a state of uncontrolled or unaddressed violence. The chancellor may, in addition to exercising any other powers authorized by this article, require such school principal, or district as the case may be, to prepare a corrective action plan, with a timetable for implementation of steps acceptable to the chancellor to reach improvement goals consistent with city board standards and educational results. The chancellor may require the school or district to alter or improve the corrective action plan, or may directly modify the plan. The chancellor shall monitor implementation of the plan, and, if the school or district fails to implement it, may supersede any inconsistent decision of the school principal, community board or community superintendent; assume joint or direct control of the operation of the school or district to implement the corrective action plan; or take any other action authorized by this article. Any action of the chancellor to supercede an inconsistent decision of the school principal, community board or community superintendent, or to assume joint or direct control of the operation of the school or district pursuant to this subdivision may be appealed to the city board in accordance with section twenty-five hundred ninety-g of this article.**32.** Appoint a deputy, for each borough of the city of New York, responsible for coordinating and periodically meeting and consulting with the borough president, the chancellor and the community superintendents in the borough on borough-specific issues and issues of borough-wide significance, including the provision of services in support of schools and community districts such as transportation, purchasing, capital planning, and coordination with municipal services, and chancellor and city board policy with respect to the high schools.**33.** Require community school board members to participate in training and retraining in order to promote district and school performance and student

achievement, as a continuing condition for membership.**35.** Take all necessary steps to promote the effectiveness and integrity of school-based budgeting pursuant to section twenty-five hundred ninety-r of this article, including the obligations imposed by subdivision thirty-seven of this section.**36.** Develop in consultation with the city board, a procurement policy for the city school district of the city of New York, and the districts and public schools therein. Such policy shall ensure the wise and prudent use of public money in the best interest of the taxpayers of the state; guard against favoritism, improvidence, extravagance, fraud and corruption; and ensure that contracts are awarded consistent with law and on the basis of best value, including, but not limited to, the following criteria: quality, cost and efficiency. Such policy shall also include: (a) standards for quality, function and utility of all material goods, supplies and services purchased by the chancellor, superintendents or schools; (b) regulations for the purchase of material goods, supplies and services by the chancellor, the superintendents and the schools, including clearly articulated procedures which require a clear statement of product specifications, requirements or work to be performed, a documentable process of soliciting bids, proposals or other offers, and a balanced and fair method, established in advance of receipt of offers, for evaluating offers and awarding contracts; (c) regulations which enable superintendents and schools to purchase material goods, supplies and services directly from vendors or suppliers when such products are available at prices or other terms more economically beneficial for the purposes of the acquiring superintendent or school; and (d) regulations shall include repair services and building supplies, as defined in such regulations, for expenditures from each district's minor repair and purchasing funds pursuant to section twenty-five hundred ninety-r of this article.**37.** Establish, subject to the approval of the city board, guidelines and a system of internal controls, including internal administrative controls and internal accounting controls, with provisions for internal audits, as such terms are defined in section nine hundred fifty of the executive law. Such system shall also include a system of internal control review designed to identify weaknesses and identify actions to rectify them; a clear and concise statement of the generally applicable management policies and standards made available to each officer and employee relevant to fiscal and expenditure control, in addition to education and training efforts to ensure adequate understanding of internal control standards and evaluation techniques; and the designation of an internal control officer for each community district, each of whom shall report to the

chancellor and the auditor general, to execute a regular
internal audit function which shall operate in accordance with
generally accepted governmental auditing standards. The internal
auditors for the community districts shall operate in
cooperation with the auditor general, appointed by the
chancellor subject to the approval of the city board, who shall,
in addition to the functions of the internal auditors, monitor
and conduct random audits of school districts at least once
every two years for fraud, waste and mismanagement.
Notwithstanding any provision of state law or state, city or
city board regulation, the internal auditors, and the auditor
general, shall be entitled, upon their request, to all and any
documents and materials bearing in their judgment on the
finances and cost-effectiveness of the schools and the school
districts that is in the possession of the community districts,
the schools, or any officer thereof.**38.** to exercise all of the
duties and responsibilities of the employing board as set forth
in section three thousand twenty-a of this chapter with respect
to any member of the teaching or supervisory staff of schools
under the jurisdiction of the community boards. The chancellor
shall exercise all such duties and responsibilities for all
community districts or may delegate the exercise of all such
duties

## CERTIFICATE OF SERVICE

I hereby certify that one ( 1) copy of the following:

APPELLANT'S BRIEF AND SPECIAL APPENDIX
and APPENDIX ON APPEAL

was served upon Appellee's counsel via the Court's ECF System, as indicated, this 13th day of August, 2024, upon the following:


Abrams, Fensterman, Fensterman, Eisman,
   Formato, Ferrara & Wolf
Att:  Joanna Marie Ronning Topping, Esq.
81 Main Street, Suite 306
White Plains, New York 10601


Date: August 13, 2024


*/ s / Christopher J. Berlingieri*
_____

Christopher J. Berlingieri
*Attorney for Appellant*